**Slip Op. 04-15**

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: GREGORY W. CARMAN

NUCOR CORPORATION; BETHLEHEM
STEEL CORPORATION; NATIONAL
STEEL CORPORATION; AND UNITED
STATES STEEL CORPORATION,

                     **Plaintiffs,**

    **and**

STEEL DYNAMICS, INC.; WEIRTON
STEEL CORPORATION; AND
INDEPENDENT STEELWORKERS
UNION,

                     **Plaintiff-
                     Intervenors,**

    **v.**

UNITED STATES OF AMERICA,

                     **Defendant,**

    **and**

AB SANDVIK STEEL, ACERALIA
CORPORATION SIDERURGICA;
ARCELOR INTERNATIONAL AMERICA
INC.; ARCELOR PACKAGING
INTERNATIONAL; ASSOCIATION OF
GERMAN SPECIALTY COLD ROLLED
STEEL STRIP PRODUCERS; BHP STEEL
AMERICAS, LLC; BHP STEEL LTD.;
BORÇELIK ÇELIK SANAYII TICARET
A.S.; COMPANHIA SIDERÚRGICA
NACIONAL; COMPANHIA
SUDERÚRGICA PAULISTA; CORUS
STAAL BV; CORUS STEEL USA, INC.;
DONGBU STEEL CO., LTD.; HYUNDAI
HYSCO, CO., LTD.; ISCOR (PTY.) LTD.;

**Consol. Court No. 02-00612**

**JFE STEEL CORP. (FORMERLY KAWASAKI STEEL CORP. & NKK CORPORATION); KOBE STEEL LTD.; NEW ZEALAND STEEL, LTD.; NIPPON STEEL CORPORATION LTD.; NISSHIN STEEL COMPANY LTD; POSCO; SALZGITTER AG; SANDVIK STEEL COMPANY; SIDERAR S.A.I.C.; SIDERURGICA DEL ORINOCO C.A.; SIDMAR, N.V.; SOLLAC ATLANTIQUE; SOLLAC LORRAINE; SUMITOMO METAL INDUSTRIES, LTD.; THAI COLD ROLLED STEEL SHEET PUBLIC CO., LTD.; THYSSEN KRUPP STAHL AG; TRADEARBED, INC.; AND USINAS SIDERÚRGICA DE MINAS GERAIS, S.A.,**

**Defendant-Intervenors.**

[Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record are denied.  The International Trade Commission's final negative material injury determinations are sustained.  Defendant-Intervenors' Consent Motion for Oral Argument is denied.]

*Dewey Ballantine LLP*[1] (*Kevin M. Dempsey*, *Alan Wm. Wolff*) on behalf of Bethlehem Steel Corp. and United States Steel Corp.; *Skadden, Arps, Slate, Meagher & Flom, LLP* (*Robert E. Lighthizer*, *John J. Mangan*, *James C. Hecht*), Washington, D.C., on behalf of United States Steel Corp. and National Steel Corp.; *Wiley Rein & Fielding LLP* (*Charles Owen Verrill, Jr.*, *Alan H. Price*, *Timothy C. Brightbill*), Washington, D.C., on behalf of Nucor Corp., for Plaintiffs.

*Schagrin Associates* (*Roger B. Schagrin*), Washington, D.C., for Steel Dynamics, Inc., Weirton Steel Corp., and Independent Steelworkers Union, for Plaintiff-Intervenors.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, Charles A. St. Charles, Attorney-Advisor, United States International Trade Commission, for Defendant.

*Barnes, Richardson & Colburn* (*Matthew T. McGrath*, *Stephen W. Brophy*), Washington, D.C., on behalf of Association of German Specialty Cold Rolled Steel Strip Producers; *Hunton and Williams* (*William Silverman*), Washington, D.C., on behalf of AB Sandvik Steel and

---

[1] The Court notes that Dewey Ballantine LLP's Motion to Withdraw its Appearance was granted on February 9, 2004.

Sandvik Steel Company; *Kaye Scholer, LLP* (*Donald B. Cameron*, *Julie C. Mendoza*, *Randi Turner*, *Deborah Wengel Heitmann*, *Margaret Scicluna Rudin*), Washington, D.C., on behalf of POSCO, Dongbu Steel Co., Ltd., and Hyundai HYSCO, Co., Ltd; *Lafave and Sailer LLP* (*Arthur J. Lafave, III*) Washington, D.C., on behalf of Borcelik Celik Sanayii ve Ticaret A.S.; *Sharretts, Palet, Carter & Blauvelt, P.C.* (*Peter Jay Baskin*, *Gail T. Cumins*), Washington, D.C., on behalf of Thyssen Krupp Stahl AG and Salzgitter AG; *Shearman & Sterling* (*Robert S. LaRussa*, *Christopher M. Ryan*, *Thomas B. Wilner*), Washington, D.C., on behalf of Sollac Atlantique, Sollace Lorraine, Arcelor Packaging International, Arcelor International America Inc., Aceralia Corporacion Siderurgica, Sidmar, N.V., and TradeArbed, Inc.; *Steptoe & Johnson, LLP* (*Eric C. Emerson*, *Richard O. Cunningham*, *Tina Potuto Kimble*), Washington, D.C., on behalf of Corus Staal BV and Corus Steel USA, Inc.; *White & Case, LLP* (*David P. Houlihan*, *Richard J. Burke*), Washington, D.C., on behalf of Siderúrgica del Orinoco, C.A. and Siderar S.A.I.C.; *Willkie, Farr & Gallagher LLP* (*Kenneth J. Pierce*, *Jocelyn C. Flynn*, *Robert Edward DeFrancesco*) Washington, D.C., on behalf of Nippon Steel Corp., JFE Steel Corp (formerly Kawasaki Steel Corp. and NKK Corp.), Sumitomo Metal Industries, Ltd., Kobe Steel Ltd., Nisshin Steel Co., Ltd., Companhia Siderúrgica Nacional, Companhia Siderúrgica Paulista, Usinas Siderúrgica de Minas Gerais, S.A., and Thai Cold Rolled Steel Sheet Public, Co., Ltd.; *Wilmer Cutler Pickering LLP* (*Lynn M. Fischer*, *John D. Greenwald*, *Leonard M. Shambon*), Washington, D.C., on behalf of BHP Steel LLC, New Zealand Steel, Ltd., and BHP Steel Americas, Ltd.; *Wilmer Cutler Pickering LLP* (*Kristin H. Mowry*, *Gary N. Horlick*), Washington, D.C., on behalf of Iscor (Pty.) Ltd., for Defendant-Intervenors.

Dated: February 19, 2004

**OPINION**

**CARMAN, Judge:** In this consolidated action, Plaintiffs have filed two Rule 56.2 Motions for Judgment on the Agency Record: the first filed by Nucor Corporation ("Nucor"); the second filed jointly by Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation (collectively "Domestic Integrated Producers"). Plaintiffs challenge two final negative material injury determinations of the United States International Trade Commission ("ITC"): 1) *Certain Cold-Rolled Steel Products from Australia, India, Japan, Sweden, and Thailand*, Invs. Nos. 731-TA-965, 971-972, 979, 981 (Final), USITC Pub. 3536 (Sept. 2002) ("*Cold-Rolled I*"); and 2) *Certain Cold-Rolled Steel Products from Argentina, Belgium, Brazil,*

*China, France, Germany, Korea, the Netherlands, New Zealand, Russia, South Africa, Spain, Taiwan, Turkey, and Venezuela*, Invs. Nos. 701-TA-423-425, 731-TA-964, 966-970, 973-978, 980, 982-983 (Final), USITC Pub. 3551 (Nov. 2002) ("*Cold-Rolled II*"). This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). For the reasons set forth below, Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record are denied. Defendant-Intervenors' consent Motion for Oral Argument is also denied.

## STANDARD OF REVIEW

In reviewing the ITC's final determinations, the Court will hold unlawful a determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The ITC is entitled to appropriate deference in its interpretation of the material injury statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). Under *Chevron*, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-843. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843 (footnote omitted). Therefore, the Court will uphold the ITC's interpretation of the statute "if it is reasonable in light of the language, policies and legislative history of the statute." *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (Fed. Cir. 1998) (citing *Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986)).

The Court reviews the ITC's factual findings whether various provisions of the material injury statute have been met to determine if they are supported by substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  In determining if substantial evidence exists, the court must "review the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  In reviewing the ITC's factual findings, the Court should not "re-weigh the evidence but rather [] ascertain whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Chefline Corp. v. United States*, 219 F. Supp. 2d 1303, 1305 (Ct. Int'l Trade 2002) (quoting *Consol. Edison Co.*, 305 U.S. at 229).

"As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) (citations omitted).

## BACKGROUND

### I.  Procedural History.

On September 28, 2001, several domestic producers filed petitions with the United States

Department of Commerce ("Commerce") and the ITC alleging that imports of cold-rolled steel products from the twenty countries identified above were being, or were likely to be, sold in the United States at less than fair value and that imports from Argentina, Brazil, France, and Korea had received countervailable subsidies. *Notice of Initiation of Antidumping Duty Investigations: Certain Cold-Rolled Carbon Steel Flat Products From Argentina, Australia, Belgium, Brazil, France, Germany, India, Japan, Korea, the Netherlands, New Zealand, the People's Republic of China, the Russian Federation, South Africa, Spain, Sweden, Taiwan, Thailand, Turkey, and Venezuela*, 66 Fed. Reg. 54,198 (Oct. 26, 2001); *Notice of Initiation of Countervailing Duty Investigations: Certain Cold-Rolled Carbon Steel Flat Products From Argentina, Brazil, France, and the Republic of Korea*, 66 Fed. Reg. 54,218 (Oct. 26, 2001). The petitions alleged that these imports were a cause of material injury to the cold-rolled steel industry in the United States. *Cold-Rolled I* at 1; *Cold-Rolled II* at 1. On November 19, 2001, the ITC published its preliminary affirmative determination that there was a reasonable indication that an industry in the Untied States was materially injured or threatened with material injury by reason of the subject imports of cold-rolled steel. *Certain Cold-Rolled Steel Products From Argentina, Australia, Belgium, Brazil, China, France, Germany, India, Japan, Korea, Netherlands, New Zealand, Russia, South Africa, Spain, Sweden, Taiwan, Thailand, Turkey, and Venezuela*, 66 Fed. Reg. 57,985 (Nov. 19, 2001).

On July 19, 2002, Commerce published its final affirmative determinations that cold-rolled steel imports from Australia, India, Japan, Sweden, and Thailand were being sold at less than fair value. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Australia*, 67 Fed. Reg. 47,509 (July 19, 2002),

*corrected by* 67 Fed. Reg. 52,934 (Aug. 14, 2002); *Notice of Final Determination of Sales at*

*Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Japan*, 67 Fed.

Reg. 47,520 (July 19, 2002); *Notice of Final Determination of Sales at Less Than Fair Value:*

*Certain Cold-Rolled Carbon Steel Flat Products from Thailand*, 67 Fed. Reg. 47,521 (July 19,

2002); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled*

*Carbon Steel Flat Products from Sweden*, 67 Fed. Reg. 47,522 (July 19, 2002).  Commerce

published its final affirmative determinations in the antidumping investigations of the remaining

countries on October 3, 2002.  *Notice of Final Determination of Sales at Less Than Fair Value:*

*Certain Cold-Rolled Carbon Steel Flat Products from New Zealand*, 67 Fed. Reg. 62,100 (Oct.

3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled*

*Carbon Steel Flat Products From the People's Republic of China*, 67 Fed. Reg. 62,107 (Oct. 3,

2002); *Notice of Final Determination of Sales at Less Than Fair Value and Critical*

*Circumstances: Certain Cold-Rolled Carbon Steel Flat Products From The Netherlands*, 67 Fed.

Reg. 62,112 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value;*

*Certain Cold-Rolled Carbon Steel Flat Products From France*, 67 Fed. Reg. 62,114 (Oct. 3,

2002); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold Rolled*

*Carbon Steel Flat Products From Germany*, 67 Fed. Reg. 62,116 (Oct. 3, 2002); *Notice of Final*

*Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat*

*Products From Venezuela*, 67 Fed. Reg. 62,119 (Oct. 3, 2002); *Notice of Final Determination of*

*Sales at Less Than Fair Value and Critical Circumstances: Certain Cold-Rolled Carbon Steel*

*Flat Products From the Russian Federation*, 67 Fed. Reg. 62,121 (Oct. 3, 2002); *Notice of Final*

*Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat*

*Products From Korea*, 67 Fed. Reg. 62,124 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value; Certain Cold-Rolled Carbon Steel Flat Products From Turkey*, 67 Fed. Reg. 62,126 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Belgium*, 67 Fed. Reg. 62,130 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Spain*, 67 Fed. Reg. 62,132 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Brazil*, 67 Fed. Reg. 62,134 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Cold-Rolled Carbon Steel Flat Products From South Africa*, 67 Fed. Reg. 62,136 (Oct. 3, 2002); *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,138 (Oct. 3, 2002).[2]

Commerce also published its final determinations in the countervailing duty investigations of Argentina, Brazil, France, and Korea on October 3, 2002. *Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea*, 67 Fed. Reg. 62,102 (Oct. 3, 2002); *Final Negative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Oct. 3, 2002); *Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From France*, 67 Fed. Reg.

---

[2] Commerce found antidumping duty margins ranging from 153.56% for certain subject imports from India to 4.02% for subject imports from Taiwan. The specific margins for each country can be found at *Cold-Rolled I* at 36 n.222 and *Cold-Rolled II* at 12 n.59.

62,111 (Oct. 3, 2002); *Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From Brazil*, 67 Fed. Reg. 62,128 (Oct. 3, 2002). Commerce's determination regarding Argentina was negative; however, it made affirmative determinations regarding Brazil, France, and Korea.[3] *Id*.

The final ITC determinations challenged in this action were published on September 13, 2002, and November 12, 2002, wherein the ITC determined that the domestic cold-rolled steel industry was not suffering present material injury or being threatened with material injury by reason of the subject imports. *Cold-Rolled I* at 39, 45; *Cold-Rolled II* at 13, 18.[4]

## II. Applicable Law.

The ITC determines whether an industry in the United States is materially injured by reason of the subject imports in the final phase of antidumping and countervailing duty investigations. *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). Material injury is defined as "harm which is not inconsequential, immaterial, or unimportant." *Id*. § 1677(7)(A). In making its material injury determination, the ITC must consider: (1) the volume of the subject imports; (2) the subject imports' effect on prices for the domestic like product; and (3) the impact of the subject imports on the domestic industry in the context of production operations in the United

---

[3] Commerce found countervailing duty margins ranging from 12.58% for Brazil to 0.55% for certain Korean subject imports. The specific margins can be found at *Cold-Rolled I* at 28 n.170.

[4] For the purposes of this opinion, the ITC's determinations are considered together. Because the record before the ITC was nearly identical in both determinations, the ITC expressly adopted the findings and analysis of *Cold-Rolled I* in its final negative material injury determination in *Cold-Rolled II*. *Cold-Rolled II* at 4, 11-12, 14. Most of the ITC's substantive analysis is contained in *Cold-Rolled I*; thus, most citations in this opinion reference *Cold-Rolled I* and the ITC's determination in *Cold-Rolled II* is implicitly included.

States.  *Id*. § 1677(7)(B)(i); *see also*, *Angus Chem. Co. v. United States*, 140 F.3d 1478, 1484 (Fed. Cir. 1998).  The ITC may consider other economic factors that are relevant to the material injury determination.  19 U.S.C. § 1677(7)(B)(ii).

Regarding volume, the ITC must consider whether the volume of subject imports is significant.  *Id*. § 1677(7)(C)(i).  The ITC must consider whether there has been significant price underselling and whether subject imports depress or suppress domestic prices to a significant degree in evaluating the subject imports' effect on domestic prices.  *Id*. § 1677(7)(C)(ii)(I-II).  To determine the impact of the subject imports, the ITC must evaluate "all relevant economic factors which have a bearing on the state of the [domestic] industry."  *Id*. § 1677(7)(C)(iii).  These factors include, but are not limited to: "decline in output, sales, market share, profits, productivity, return on investment, and [capacity utilization], factors affecting domestic prices, actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, . . . negative effects on the existing development and production efforts of the domestic industry, . . . [and] the magnitude of the margin of dumping."  *Id*. § 1677(7)(C)(iii) (I-V).  The ITC must evaluate these factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  *Id*. § 1677(7)(C)(iii).  The ITC "shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which . . . petitions were filed . . . on the same day . . . if such imports compete with each other and with domestic like products in the [domestic] market."  *Id*. § 1677(7)(G)(i)(I).

DISCUSSION

In *Cold-Rolled I* and *Cold-Rolled II*, the ITC determined that "an industry in the United States is not materially injured . . . by reason of imports of certain cold-rolled steel products." *Cold-Rolled I* at 3; *Cold-Rolled II* at 1. The ITC's specific findings are presented before the parties' contentions in each section below. Plaintiffs challenge five aspects of the ITC's final negative material injury determinations: 1) the ITC's interpretation and application of the causation requirement under the material injury statute; 2) the ITC's finding that the volume of subject imports was not significant; 3) the ITC's finding that subject imports did not have significant effects on prices for the domestic like product; 4) the ITC's finding that subject imports did not have an adverse impact on the domestic industry; 5) the ITC's decision to not cumulate subject imports from Australia. (Mem. of Nucor Corp. in Support of Mot. Under R. 56.2 for J. on the Agency R. ("Nucor's Br.") at 11-13); (Mem. in Support of Mot. for J. on the Agency R. under R. 56.2 Filed by Pls. Bethlehem Steel Corp., National Steel Corp., and U. S. Steel Corp. ("Domestic Integrated Producers' Br.") at 13-16.)


## I. The ITC's Interpretation and Application of the Material Injury Statute's Causation Requirement.

### ITC's DETERMINATION

In making its final negative material injury determination, the ITC considered the volume, price effects, and impact of the subject imports for the period of investigation ("POI") from January 1999 through June 2002. *Cold-Rolled I* at 25, 30-31.

At the outset, the ITC identified several conditions of competition that had an effect on the cold-rolled steel industry in the United States during the POI. *Id.* at 21. Specifically, the ITC

considered the "restructuring" of the domestic cold-rolled steel industry during the POI, domestic

sales conditions for cold-rolled steel, and the Section 201 safeguard proceedings and resulting

tariffs.[5]  *Id.* at 23-30.

First, the ITC noted that during the POI, the domestic "cold-rolled steel industry

restructured significantly." *Id.* at 24.  The ITC stated that "Gulf States Steel ceased operations;

Bethlehem, National, and Wheeling operated under Chapter 11 of the U.S. Bankruptcy Code; the

operating assets of Heartland Steel and LTV were purchased by new owners . . . ; a purchase of

operating assets of Acme Steel, which had ceased operations, is pending in bankruptcy court; and

Cold Metal Products recently announced its intention to file for Chapter 11 bankruptcy and to

close its Indianapolis and Youngstown plants." *Id.*

------------

[5] In June 2001, at the request of the President, the ITC conducted a Section 201 investigation of steel products imported between January 1997 and June 2001. *Steel; Import Investigations*, Inv. No. TA-201-73, 66 Fed. Reg. 67,304, 67,307 (Dec. 28, 2001).  The Section 201 investigation included the cold-rolled products subject to these AD/CVD investigations. *Cold-Rolled I* at 27.  In October 2001, the ITC determined that steel products, including cold-rolled steel products, "were being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry." *Id.* (citing *Steel; Import Investigations*, 66 Fed. Reg. 67,304).  Following the ITC's remedy recommendations issued in December 2001, the President announced safeguard tariffs on steel products, including the subject cold-rolled steel products in March 2002. *Id.* (citing *Presidential Proclamation 7529 of March 5, 2002 – To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products*, 67 Fed. Reg. 10,553 (Mar. 7, 2002) ("Presidential Proclamation 7529")).  The tariffs announced were 30% *ad valorum* in the first year, 24% *ad valorum* in the second year, and 18% *ad valorum* in the third year of the safeguard period. *Id.* (citing Annex to Presidential Proclamation 7529, ¶ 11(d)).

Safeguard actions are taken by the President under Section 203 of the Trade Act of 1974, 19 U.S.C. § 2253.  However, safeguard actions are commonly referred to as "Section 201" relief or remedies referencing Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251(a), which instructs the President to "take all appropriate and feasible action . . . [to] facilitate efforts by the domestic industry to make a positive adjustment to import competition." 19 U.S.C. § 2251(a).  The parties refer to the ITC's investigation and the President's subsequent tariff announcement as the Section 201 proceedings or tariffs, so the Court will do likewise.

Next, the ITC examined price and non-price factors that are important in purchasing

decisions for cold-rolled steel.  *Id.* at 26-27.  The ITC found that importers reported an average

102-day lead time between order and delivery.  *Id.* at 26.  The ITC also found that approximately

55% of sales by domestic producers and 52% of sales by importers were on a contract basis.  *Id.*

The remaining sales were on a spot price basis.  *Id.*  The ITC noted that although contract prices

are generally fixed for a certain period of time, spot prices can "have some impact on contract

prices . . . when new contracts are negotiated, expired contracts are renegotiated, or . . . [when]

sellers demand[] price increases or buyers demand[] price concessions under executory contracts

when spot prices differ significantly from contract prices."  *Id.*  The ITC noted that the domestic

industry claimed that "the majority of contracts remained in place in 2002 at low prices that were

negotiated in the fourth quarter of 2001."  *Id.* at 27.

Third, the ITC identified the Section 201 proceedings as a condition of competition that

had "a major impact" on the cold-rolled steel industry during this POI.  *Id.* at 30.  The ITC found

that the ITC's Section 201 investigation and the subsequent tariffs announced by the President

"fundamentally altered the U.S. market for many steel products, including cold-rolled steel."  *Id.*

at 28.

After examining the volume of subject imports, the subject imports' effect on domestic

prices, and the impact of the subject imports on the domestic industry, the ITC concluded:

> following the imposition of Section 201 relief, subject import volumes declined to
> minimal levels, and therefore we do not find the current volume of subject imports
> to be significant.  Nor do we find that subject imports currently in the market are
> having significant adverse price effects, given their minimal presence in the U.S.
> market.  Accordingly, we do not find that the present condition of the domestic
> industry is attributable in any material respect to the current subject imports, and we
> therefore do not find that any material injury currently being experienced by the

domestic industry is by reason of the subject imports.

*Id.* at 39.

PARTIES' CONTENTIONS

**A. Nucor's Contentions.**

Nucor contends that as a matter of law, the ITC "applied an incorrect injury test in reaching a negative determination." (Reply Br. of Nucor Corp. in Supp. of Mot. Under R. 56.2 For J. on the Agency R. ("Nucor's Reply Br.") at 4.) Nucor contends that the ITC's analysis is flawed for three reasons: 1) the ITC "narrowly focused" on current imports; 2) the ITC failed to consider whether injury was being caused by imports that entered earlier in the POI; and 3) the ITC unreasonably relied on the effects of the Section 201 proceedings. (*Id.* at 4-5; Nucor's Br. at 48.)

First, Nucor contends that the ITC has never based any prior material injury determination "so overtly" on current imports. (Nucor's Reply Br. at 5.) Nucor highlights the ITC's language in *Cold-Rolled I* that focuses on "<u>current</u> subject imports." (*Id.* (citing *Cold-Rolled I* at 39).) Nucor contends that the statute requires the ITC to make an affirmative injury determination if subject imports are causing present material injury. (*Id.* at 5-6.) However, Nucor stresses that the statute does not mention <u>current</u> imports or require that the present injury be caused by <u>current</u> imports. (*Id.* at 7.) Nucor contends that the ITC's determination placed "exclusive focus" on the last three months of the investigation, "elevating [the] last quarter . . . [to] prominence." (*Id.* at 8.) Nucor contends that the ITC's determination "brushed aside, without explanation, data regarding 39 months of a 42-month investigation." (Nucor's Br. at 14.) Nucor asserts that, contrary to the ITC's statement that its analysis included the entire POI, most

of the ITC's discussion focused solely on current imports in the second quarter of 2002.  (*Id.* (citing *Cold-Rolled I* at 31 n.182, 32).)  Nucor argues that the ITC is required to base its decision on a "review of the entirety of the record."  (*Id.* (quoting *Chr. Bjelland Seafoods A/S v. Untied States*, 19 Ct. Int'l Trade 35, 43 (1995) ("*Seafoods II*")).)  Nucor contends that the "entire procedural history" of *Chr. Bjelland Seafoods A/C v. United States*, 16 Ct. Int'l Trade 945 (1992) ("*Seafoods I*") and *Seafoods II* should instruct the Court in examining this case.  (Nucor's Reply Br. at 8-9.)  Relying on the holding in *Seafoods II*, Nucor argues that current imports "cannot provide the sole basis for [an ITC] determination."  (*Id*. at 9 (citing *Seafoods II*, 19 Ct. Int'l Trade at 38-47).)  Nucor contends that the ITC must determine whether the domestic industry is presently materially injured and must consider if that injury is caused by subject imports, current or otherwise.  (*Id*. at 9-10.)

Second, Nucor asserts the ITC failed to adequately consider whether material injury was being caused by subject imports that were entered earlier in the POI.  (*Id*. at 10.)  Nucor emphasizes several of the ITC's findings that it claims demonstrate that subject imports entered earlier in the POI were causing present material injury: (1) three producers declared bankruptcy during the POI; (2) the domestic industry suffered operating losses of $688 million in the first half of 2002; (3) low-priced contracts negotiated in 2001 continued to be honored in the first half of 2002; and (4) the domestic market showed declines in employment and capacity.  (*Id*. at 11-13 (citing *Cold-Rolled I* at 26, 38-39).)  Nucor contends that the ITC failed to explain why all of these declining economic conditions "failed to constitute current material injury."  (*Id*. at 13.)  Nucor asserts that if the correct causation test had been applied, the ITC would have found that the domestic industry continued to suffer present material injury caused by imports that were

entered earlier in the POI. (*Id.*)

Third, Nucor contends that the ITC cannot base its negative material injury determination on the effects of the Section 201 remedy. (Nucor's Br. at 48.) Nucor asserts that the ITC's reliance on the effects of the Section 201 tariffs is "misplaced as a matter of law." (*Id.*) According to Nucor, the ITC essentially found that the Section 201 tariffs imposed by the President "were preventing the subject imports from injuring the domestic industry." (*Id.*) Yet, Nucor contends that eleven of the twenty countries under investigation had dumping margins greater than 30%. (*Id.* (citing *Cold-Rolled I* at I-8, *Cold-Rolled II* at I-5).) Nucor contends that the ITC's negative material injury determination runs counter to the intention of the antidumping and countervailing duty laws "to equalize . . . competitive conditions between foreign exporters . . . and the domestic industry." (*Id.* (quoting *Seafoods II*, 19 Ct. Int'l Trade at 43).) Nucor contends that the Section 201 tariffs do not "offset the full margin of dumping." (*Id.*) Nucor concludes that the ITC's reliance on the 30% Section 201 tariffs essentially "depriv[ed] the U.S. industry of the protection to which it is entitled under law." (*Id.* at 49.)

**B. Domestic Integrated Producers' Contentions.**

Domestic Integrated Producers contend that the ITC's negative determination was based upon the imposition of a causation requirement that is not in accordance with law. (Domestic Integrated Producers' Br. at 16.) Domestic Integrated Producers assert that in order to make an affirmative determination under the statute, the ITC must find that the domestic industry is suffering "present material injury." (*Id.* at 17.) However, Domestic Integrated Producers contend that in this case the ITC misinterpreted the statute to require that the present material injury be caused by <u>current</u> or <u>present</u> imports. (*Id.* at 18 (citing *Seafoods I*, 16 Ct. Int'l Trade at

953-954).)  Domestic Integrated Producers contend that this requirement – "that <u>current</u> imports

be causing injury" – is not in accordance with law.  (*Id.*)  Domestic Integrated Producers quote

three specific passages from the ITC's determination in *Cold-Rolled I* that they claim

demonstrate the ITC's use of an improper causation requirement:

> (1) [W]hile we recognize the higher subject import volumes earlier in the period, we find that the <u>present</u> volume of subject imports is not significant.
>
> (2) [S]ubject imports <u>currently</u> entering the market are not suppressing <u>current</u> domestic prices to a significant degree.  Thus, we find that subject imports are not adversely affecting domestic prices to a significant degree based on the <u>current</u> volume of subject imports and the increase in domestic prices in 2002.
>
> (3) [W]e do not find the <u>current</u> volume of subject imports to be significant.  Nor do we find that subject imports <u>currently</u> in the market are having significant adverse price effects . . . .  Accordingly, we do not find that the present condition of the domestic industry is attributable in any material respect to the <u>current</u> subject imports, and we therefore do not find that any material injury currently being experienced by the domestic industry is by reason of the subject imports.

(*Id.* (quoting *Cold-Rolled I* at 33, 36, 39) (emphasis added).)  In its reply brief, Plaintiff, United

States Steel Corporation, asserts that the material injury statute does not focus on current imports.

(Reply Br. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. of Pl. U.S. Steel Corp. ("U.S.

Steel's Reply Br.") at 2.)  U.S. Steel contends that the statute clearly directs the ITC to determine

if the domestic industry "is materially injured . . . by reason of imports."  (*Id.* at 2-3 (quoting 19

U.S.C. § 1671d(b)).)  However, U.S. Steel argues that by focusing on current imports, the ITC

improperly added a limitation to the statute.  (*Id*. at 3.)

Domestic Integrated Producers contend that if the ITC had applied the correct causation

standard, the ITC would have been compelled by its own findings to make an affirmative injury

determination based on the injury caused by imports that were entered earlier in the POI.

(Domestic Integrated Producers' Br. at 21.) Domestic Integrated Producers echo Nucor's argument that the law requires the ITC to make an affirmative material injury determination if imports entered earlier in the POI are causing present material injury. (*Id.* at 18-19 (citing *Seafoods I*, 16 Ct. Int'l Trade at 953-954, *Seafoods II*, 19 Ct. Int'l Trade at 48).) Domestic Integrated Producers contend that the Court's holding in *Seafoods II* should instruct this Court's analysis. (*Id*. at 19.) Domestic Integrated Producers assert that in *Seafoods II*, the Court upheld an ITC affirmative material injury determination which found that, although current imports were minimal, earlier imports of salmon were causing present material injury to the domestic industry by impairing the domestic industry's ability to raise capital at the end of the period of investigation. (*Id.* at 19 (citing *Seafoods II*, 19 Ct. Int'l Trade at 48).) Similarly, Domestic Integrated Producers argue that in this case earlier imports of cold-rolled steel caused present material injury to the domestic industry. (*Id*. at 21.) Domestic Integrated Producers contend that in prior investigations and in another forum, the ITC has argued that imports entered earlier in the POI can cause present injury. (*Id.* at 19-20 (citing *Hot Rolled Steel Products From Argentina and South Africa*, Invs. Nos. 701-TA-404 and 731-TA-898, 905 (Final), USITC Pub. 3446 (Aug. 2001); *Written Rebuttal of the United States, United States - Definitive Safeguard Measures on Imports of Certain Steel Products*, WT/DS248-249, 251-254, 258-259 (Nov. 26, 2002) at 39 ¶ 120).) U.S. Steel adds that any analysis that does not fully consider whether earlier imports are causing present material injury is "incomplete as a matter of law," and the ITC's determination in this case should be remanded for this reason. (U.S. Steel's Reply Br. at 5, 9-10.)

Domestic Integrated Producers point to evidence on the record that they claim supports a finding that earlier imports caused present material injury in this case. (Domestic Integrated

Producers' Br. at 20.) Domestic Integrated Producers note that the ITC found that several

domestic steel companies filed for bankruptcy during the POI and assert that the government has

made arguments in other proceedings that bankruptcies are evidence of present injury caused by

earlier imports. (*Id.* at 21-22 (citing *Cold-Rolled I* at 24).) Further, Domestic Integrated

Producers contend that the "enormous operating losses" sustained by the domestic industry

throughout the POI, which were partly attributable to the low contract prices negotiated in 2001,

are also evidence that the subject imports entered earlier in the POI caused present material

injury. (*Id.* at 22-24.)

Finally, Domestic Integrated Producers claim that the ITC erroneously based its negative

material injury determination on speculation that the Section 201 tariffs will alleviate future

injury. (*Id*. at 25.) Domestic Integrated Producers contend that "if a finding of present material

injury is otherwise warranted," the ITC cannot make a negative determination "simply because

circumstances have changed in a manner that <u>may</u> alleviate injury in the future." (*Id*.) Domestic

Integrated Producers assert that the ITC's analysis of the effect of the Section 201 tariffs on the

domestic industry is "little more than guesswork." (*Id*.) Domestic Integrated Producers contend

that the ITC used the Section 201 tariffs to "alter the legal standard to be used in determining

whether the requisite injury has been proven." (*Id*.) Domestic Integrated Producers highlight

several differences between AD/CVD relief and Section 201 relief including: 1) several countries

subject to these AD/CVD investigations were exempt from the Section 201 tariffs; 2) numerous

products covered by these AD/CVD investigations are not covered by the Section 201 tariffs; and

3) Section 201 tariffs expire in three years whereas Title VII duties can last indefinitely. (*Id.* at

26.) Domestic Integrated Producers contend that these differences should have precluded the

ITC from using the Section 201 relief in its analysis. *Id.*

Domestic Integrated Producers conclude that the ITC's final determination is not in accordance with law because the ITC applied an incorrect causation standard, failed to consider earlier imports, and improperly considered the Section 201 relief. (*Id.* at 28-29.)

**C. Defendant's Contentions.**

First, Defendant contends that Plaintiffs' assertions regarding the ITC's focus on current imports "ignores that statute's remedial purpose, the prospective application of duties and the [ITC's] concomitant discretion to rely on current data." (Mem. of Def. U.S. Int'l Trade Comm'n in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.'s Br.") at 42.) Defendant contends that the Court has reasoned that the antidumping and countervailing duty laws "'are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury.'" (Def.'s Br. at 43 (quoting *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103 (Fed. Cir. 1990) (in turn citing S. REP. NO. 96-249, at 87 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 473)).) Defendant asserts that older information "'provide[s] a historical frame of reference against which a 'present' (i.e., as recent to vote day as possible . . .) material injury determination is to be made.'" (*Id.* (quoting *Seafoods II*, 19 Ct. Int'l Trade at 44 n.22).) Defendant asserts that the ITC's focus on current imports is consistent with the antidumping and countervailing duty statutes' focus on present material injury. (*Id.*)

Second, Defendant contends that contrary to Plaintiffs' assertions, the statute does not require the ITC to reach an affirmative injury determination based on the lingering effects of earlier imports. (*Id.* at 87.) Defendant contends that "the statute provides a focus on current imports and their current impact in determining whether the [domestic] industry is currently

materially injured." (*Id*. at 88.) Defendant quotes *Seafoods II*, stating that "'any adverse

lingering effects of past material injury . . . are insufficient to support an affirmative injury

determination'" unless those lingering effects are "'themselves a source of present material injury

to the domestic industry.'" (*Id.* (quoting *Seafoods II*, 19 Ct. Int'l Trade at 48).) Defendant

contends that present material injury from the lingering effects of earlier imports was not

demonstrated in the record. (*Id*. at 87-88.) Defendant asserts that the Court's recognition in

*Seafoods II*, that the effects of earlier imports <u>may</u> support an affirmative injury determination,

did not create a presumption that lingering effects cause present material injury. (*Id.* at 88.)

Defendant concludes that the ITC's determination that subject imports were not causing present

material injury is supported by substantial evidence and is in accordance with law. (*Id*. at 88-89.)

**D. Defendant-Intervenors' Contentions.**

Defendant-Intervenors contend that Plaintiffs' argument asks this Court and the ITC to

"ignore the remedial purpose of the [antidumping and countervailing duty] statute and impose

punitive . . . duties to punish past allegedly injurious activity that no longer continues." (Mem. in

Support of the Determination of the U.S. Int'l Trade Comm'n and in Opp'n to Nucor, et al.'s

[sic] Rule 56.2 Mot. for J. on the Agency R. ("Def.-Intvs.' Br.") at 15.) First, Defendant-

Intervenors contend that the ITC properly focused on the most recent period in its final

determinations and correctly found that there was no present "causal nexus between subject

imports and injury." (*Id*. at 14-15.) Second, Defendant-Intervenors contend that contrary to

Plaintiffs' claims, the ITC is not legally precluded from considering the impact of the Section

201 proceedings on the domestic market. (*Id*. at 18.)

First, Defendant-Intervenors assert that the ITC did not misapply the legal causation

standard in considering the injury caused by subject imports. (*Id.* at 18-19.) Defendant-Intervenors contend that the parties do not dispute that the statute "requires a causal nexus between the subject imports and the injury." (*Id.* at 19 (citing *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720, 722 (Fed. Cir. 1997)).) Defendant-Intervenors claim that Plaintiffs attempt to persuade this Court that the ITC made "a mere temporal finding – that little or no imports at the end of the [POI] automatically suggested no causation of injury." (*Id.*) Defendant-Intervenors contend that this is not the case. (*Id.*) Defendant-Intervenors contend that, in fact, the ITC properly determined that, given the fundamental change in the conditions of competition due to the Section 201 proceedings, "the past subject imports were not causing present material injury to the domestic industry." (*Id.*) Defendant-Intervenors argue that the Section 201 proceedings severed any causal link between the subject imports and any injury to the domestic industry. (*Id.* at 19.) Defendant-Intervenors contend that the ITC should give primary weight to current data to give full effect to the remedial purpose of the antidumping statute. (*Id.* at 21.) Defendant-Intervenors emphasize that antidumping and countervailing duties are intended to "prevent future harm." (*Id.* (citing *Chaparral Steel*, 901 F.2d at 1103).) Given the improvements in the industry and the withdrawal of imports in 2002, Defendant-Intervenors contend that any antidumping or countervailing duties assessed based on earlier imports would have been punitive and not prospective as the statute intends. (*Id.* at 23.)

Defendant-Intervenors assert that it would have been improper for the ITC to disregard the "obvious effect" that the Section 201 proceedings had on the domestic market during the POI. (*Id.* at 21.) Defendant-Intervenors assert that this Court has instructed the ITC to pay attention to changed circumstances and current market conditions. (*Id.* at 21-22 (citing *Seafoods*

*II*, 19 Ct. Int'l Trade at 43-44 n.22).)  Defendant-Intervenors contend that Plaintiffs raise no

argument against the ITC's finding that the Section 201 proceedings had a dramatic effect on the

domestic market in 2002; rather, Defendant-Intervenors assert that Plaintiffs ask this Court to

reverse the ITC's material injury determination based on alleged injury caused by low-priced

contracts negotiated prior to the imposition of the Section 201 relief.  (*Id.* at 20.)  Defendant-

Intervenors contend that Plaintiffs fail to show a "causal link between such alleged injury and

current subject imports."  (*Id.*)  Defendant-Intervenors contend that Plaintiffs' allegation that the

ITC failed to consider the effects of earlier imports is "merely another way of saying that the

[ITC] gave too much weight to the [Section 201 proceedings]."  (*Id.* at 21.)  Defendant-

Intervenors contend that "the mere existence of any lingering injury does not establish causation

by [the] subject imports."  (*Id.* at 24.)  Defendant-Intervenors contend that the Court in *Seafoods*

*II* recognized that earlier imports could create "an enduring condition of competition in the

marketplace that continues to presently cause injury to U.S. producers."  (*Id.* at 25 (citing

*Seafoods II*, 19 Ct. Int'l Trade at 48).)  However, Defendant-Intervenors question whether the

pricing of annual contracts could be considered an enduring condition of competition.  (*Id.*)

Defendant-Intervenors note that contract prices will not remain depressed when they are

renegotiated in the next year to reflect the change in the domestic market.  (*Id.*)  Defendant-

Intervenors contend that Plaintiffs seek a re-weighing of the evidence urging this Court to give

more weight to the low-priced contracts than to the evidence of the dramatic changes in the

market following the imposition of Section 201 relief.  (*Id.* at 25-26.)  Defendant-Intervenors

conclude that the ITC correctly applied the causation standard of the material injury statute when

it determined that the domestic industry was not suffering any present material injury.  (*Id.*)

ANALYSIS

**A. The ITC Properly Interpreted and Applied the Causation Requirement Under the Material Injury Statute.**

The Court holds that the ITC correctly interpreted and applied the causation requirement in finding no present material injury to the domestic industry. Under the material injury statue, Congress instructs the ITC to determine "whether an industry in the United States is materially injured . . . by reason of imports." 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1).[6] Here, the ITC determined that "we do not find the current volume of subject imports to be significant. Nor do we find that subject imports currently in the market are having significant adverse price effects . . . , we do not find that the present condition of the domestic industry is attributable in any material respect to the current subject imports, and we therefore do not find that any material injury currently being experienced by the domestic industry is by reason of the subject imports." *Cold-Rolled I* at 39 (emphasis added). The specific issue to be decided by this Court is whether the ITC's focus on current subject imports is a proper interpretation and application of the statute's causation requirement that material injury be "by reason of imports." *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1).

_____

[6] In full, § 1671d(b)(1), covering countervailing determinations, and § 1673d(b)(1), covering antidumping determinations, state:

(1) In general
The Commission shall make a final determination of whether –
(A) an industry in the United States–
(i) is materially injury, or
(ii) is threatened with material injury, or
(B) the establishment of an industry in the Unites States is materially retarded,
by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)[] of this section. If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated.

This Court accords substantial weight to the agency's interpretation of the statute that it administers. *See Chevron*, 467 U.S. at 844. Under *Chevron*, this Court is directed to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-843. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843 (footnote omitted).

In this case, the statute is "silent . . . with respect to the specific issue," *id.*, of whether the ITC may permissibly focus on current imports in determining material injury. The statute states that injury must be "by reason of imports," and makes no mention of whether the ITC's determination must rest on current imports, earlier imports, or both. 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). It is well-settled that the material injury statute requires that the domestic industry be suffering present material injury. *Chaparral Steel*, 901 F.2d at 1104 (citations omitted). However, Plaintiffs contend that the ITC cannot rest its present material injury determination on the volume, price effects, and impact of the current subject imports. In light of the purpose of the AD/CVD laws and the discretion given to the ITC to focus on the most recent data, this Court holds that the ITC's construction of the statute to focus on current imports is reasonable.

Antidumping and countervailing duties are meant "to afford prospective relief to the domestic industry which would otherwise experience further injury due to the continued importation of unfairly traded merchandise." *Seafoods II*, 19 Ct. Int'l Trade at 44 n.22. Antidumping and countervailing duty laws "are not penal, retaliatory, or compensatory"; rather,

they "are intended to equalize particular aspects of <u>future competitive conditions</u> between foreign exporters to the United States and the domestic industry." *Id.* (emphasis added) (citing *Imbert Imports, Inc. v. United States*, 331 F. Supp. 1400, 1406 n.10 (Cust. Ct. 1971) (citation omitted), *aff'd*, 475 F.2d 1189 (C.C.P.A. 1973)).

In reviewing other determinations, this Court has maintained that "the [ITC] permissibly focuses on the more recent . . . period in evaluating the <u>causal effects</u> of the subject imports." *Taiwan Semiconductor Indus. Ass'n v. United States*, 93 F. Supp. 2d 1283, 1294 n.13 (Ct. Int'l Trade 2000) (citing *Seafoods II*, 19 Ct. Int'l Trade at 48) (emphasis added), *aff'd*, 266 F.3d 1339 (Fed. Cir. 2001). Further, this Court has held that the ITC "may of course permissibly focus its analysis on a specific time frame within the POI." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1363 (Ct. Int'l Trade 2001) (citations omitted); *see also*, *Angus Chem. Co. v. United States*, 944 F. Supp. 943, 947-948 (Ct. Int'l Trade 1996) (stating that the ITC's "decision to focus on [current] data and make only limited comparisons [of earlier] data fell well within its discretion" (citation omitted)), *aff'd*, 140 F.3d 1478 (Fed. Cir. 1998); *Chaparral Steel*, 901 F.2d at 1103 (upholding the ITC's focus on <u>current</u> unfair imports, versus those earlier in the period of investigation, in its cumulation analysis because such construction was "in accord with the remedial purpose of duties which are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury" (citation omitted)).

In *Seafoods II*, the Court held that the ITC must examine data within a time frame as close as possible to vote day in making its present material injury determination. *Seafoods II*, 19 Ct. Int'l Trade at 44 n.22. "[W]ithin the time frame established by the ITC for its investigation,

relatively older information serves to provide a historical frame of reference against which a 'present' (i.e.[,] as recent to vote day as possible, given the limitations of the collected data) material injury determination is to be made, and without which any assessment of the extent of changed circumstances would be impossible." *Id.* (citations omitted).

Here, the ITC's negative material injury determination clearly rested on its findings regarding current subject imports. *See Cold-Rolled I* at 39.  Contrary to Plaintiffs' contentions, however, the ITC did not "impose a requirement that current imports be causing injury." (Domestic Integrated Producers' Br. at 16-17.)  Rather, in keeping with the remedial purpose of the trade laws, the ITC used current subject import data that was "as nearly contemporaneous to vote day as possible" to evaluate the causal relationship between the subject imports and any material injury.  *See Seafoods II*, 19 Ct. Int'l Trade at 44 n.22.  As Defendant and Defendant-Intervenors contend, the ITC's negative determination was based upon an examination of the entire period of investigation with a focus on the current 2002 imports.  As discussed below in the separate factor analyses, the ITC considered data from 1999, 2000, 2001, and 2002 to determine the significance of volume, price effects, and impact of the subject imports on the domestic industry.  *See Cold-Rolled I* at 32-39.  As the Court directed in *Seafoods II*, the ITC used the earlier data from 1999-2001 as "a historical frame of reference" to make its injury determination.  *See Seafoods II*, 19 Ct. Int'l Trade at 44 n.22.  Thus, the Court holds that the ITC reasonably focused on current subject imports in its application of the material injury statute's "by reason of imports" causation requirement.

1. **The ITC Adequately Considered the Effects of Subject Imports Entered Earlier in the POI and Reasonably Concluded that They Were Not Causing Present Material Injury to the Domestic Industry.**

This Court reviews the ITC's factual determinations of whether the various provisions of the statute have been met in this case to determine if they are supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i); *see also*, *Enercon GmbH*, 151 F.3d at 1381 (citation omitted). Plaintiffs contend that the ITC's negative material injury determination is deficient because it failed to explicitly consider whether subject imports that were entered earlier in the POI caused present material injury to the domestic industry. (Domestic Integrated Producers' Br. at 20-21; Nucor's Reply Br. at 5.) Plaintiffs contend that if the ITC had adequately considered earlier imports as a cause of present material injury, the ITC "would have been compelled by its own findings of fact" to make an affirmative present material injury determination. (Domestic Integrated Producers' Br. at 21; *see also*, Nucor's Reply Br. at 10-14.)

This Court finds that the ITC adequately considered the effects that the earlier imports continued to have on the domestic industry at the end of the POI and reasonably concluded that the effects of earlier imports were insufficient to find present material injury. Although the ITC did not explicitly state that earlier imports were not causing present material injury, "the agency's path may be reasonably discerned," *Ceramica Regiomontana*, 810 F.2d at 1139, through the ITC's continued discussion of the effects that subject imports entered earlier in the POI had on the domestic industry and its ultimate conclusion that the domestic industry was not suffering present material injury. Contrary to Plaintiffs' contentions, the Court finds that the ITC's "quest for up-to-date information" was not "at the expense of overlooking the 'possibility that negative effects of a present material injury are latent.'" *Saarstahl AG v. United States*, 858 F. Supp. 196,

200 (Ct. Int'l Trade 1994) (quoting *Seafoods I*, 16 Ct. Int'l Trade at 956).  Specifically, the ITC

discussed the lower-priced contracts negotiated in 2001 and their effect on domestic prices:

"although subject imports which entered the market earlier in the period examined continue to

have an effect on the industry's contract prices negotiated before the Section 201 relief was

effective, subject imports currently entering the market are not suppressing current domestic

prices to a significant degree." *Cold-Rolled I* at 36.  The ITC also noted that several domestic

producers filed for bankruptcy during the POI, *id.* at 24, but found that "the industry's condition

began to improve as prices rose and shipments increased" in 2002, *id*. at 37.  The ITC considered

the operating losses that the domestic industry experienced at the end of the POI and found that

those losses had declined from an industry high in 2001.  *Id*. at 38.  The Court finds that

substantial evidence in the record supports the ITC's finding that the effects of earlier imports

were insufficient to find present material injury.  As discussed in more detail in the separate

sections below, the ITC weighed the evidence of the subject imports' effect on the domestic

market, including the effect of earlier imports, against the evidence of the sharp decline in subject

import volume in 2002 and other indica of the domestic industry's recovery in making its final

determination.  *See id.* at 32-39.  Although Plaintiffs contend that an examination of the evidence

could result in a different conclusion, "it is not the province of this court to review the record

evidence to determine whether a different conclusion could be reached, but to determine whether

[the agency's] determination is supported by substantial evidence." *Hoogovens Staal BV v.

United States*, 138 F. Supp. 2d 1352, 1360 (Ct. Int'l Trade 2001) (citing *Inland Steel Indus., Inc.

v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999) (in turn citing *P.P.G. Indus., Inc. v.

United States*, 978 F.2d 1232, 1236 (Fed. Cir. 1992))).  This Court holds that substantial

evidence supports the ITC's finding that the effects of earlier imports were insufficient to support a present material injury determination.

## 2. The ITC's Consideration of the Effect of the Section 201 Proceedings on the Domestic Industry is in Accordance with Law.

The material injury statute directs the ITC to evaluate all relevant economic factors (i.e., volume, price effects, and impact) "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C). Although Plaintiffs contend that the ITC's consideration of the effect of the Section 201 Proceedings is not in accordance with law, the Court has instructed the ITC to "address record evidence of significant circumstances and events that occur between the petition date and the vote day." *Usinor v. United States*, No. 01-00010, 2002 Ct. Int'l Trade LEXIS 98, at *33 (Ct. Int'l Trade 2002). The Court has required the ITC to account for "changed circumstances . . . which impact a present material injury inquiry." *Seafoods II*, 19 Ct. Int'l Trade at 44 n.22. The Court has reasoned that "[a]ccounting for changed circumstances in an assessment of whether a domestic industry is experiencing 'present' material injury accords with the purely remedial purpose of our trade laws." *Id*. (citations omitted).

Here, the ITC found that "the Section 201 investigation and the President's remedy fundamentally altered the U.S. market for many steel products, including cold-rolled steel." *Cold-Rolled I* at 28. The ITC considered the evidence of a significant event that occurred "between the date of the petition and vote day," *Seafoods II*, 19 Ct. Int'l Trade at 44 n.22, namely, the Section 201 proceedings. *See Cold-Rolled I* at 27-30. The ITC examined certain data to determine the impact of the Section 201 proceedings on the domestic industry. *See id.* at

21, 28-30.  As detailed in Part II.ANALYSIS.A.1 below, the ITC's examination of data from before and after the Section 201 proceedings demonstrated that the Section 201 proceedings were a significant condition of competition that affected the domestic cold-rolled steel industry.  Although, as Plaintiffs contend, there are differences in the scope and nature of the Section 201 proceedings and AD/CVD investigations, the ITC considered these differences in making its final determinations.  *See, e.g.*, *id*. at 27 (listing the countries that were exempt from the Section 201 tariffs, but which were included in these AD/CVD investigations); *id*. at 28 (taking into account the cold-rolled steel products excluded from the Section 201 tariffs that were subject to these AD/CVD investigations).  *Compare id*. at 27 (stating that the Section 201 tariffs were "30[%] *ad valorum* in the first year, 24[%] *ad valorum* in the second year, and 18[%] *ad valorum* in the third year"), *with id.* at 36 n.222 *and Cold-Rolled II* at 12 n.59 (considering the antidumping margins found by Commerce in these investigations).  This Court holds that the ITC's decision to take into account the Section 201 proceedings conforms with the remedial purposes of the trade laws and is otherwise in accordance with law.

## II.  The Volume of Subject Imports.

### ITC's DETERMINATION

The ITC found that the volume of subject imports was not significant.  *Id.* at 33.  The ITC recognized that from 1999 to 2001, the absolute volume of subject imports decreased slightly, but, at the same time, subject imports gained market share.  *Id.* at 32.  However, the ITC noted that in the first half of 2002, the subject imports experienced a "sharp decline in both the volume and market penetration."  *Id.*

In its discussion of conditions of competition, the ITC found that the Section 201 remedy "was the overwhelming factor in the decline in subject import volume in 2002, notwithstanding the pendency of these [AD/CVD] investigations." *Id.* at 28.  In finding that the Section 201 proceedings "fundamentally altered the U.S. market for many steel products, including cold-rolled steel," the ITC focused on three sets of data: 1) subject import data following key events in the Section 201 proceedings; 2) import data for other flat-rolled steel products; and 3) questionnaire responses from domestic purchasers.  *Id.* at 28-30.

First, the ITC examined various import data following certain key events in the Section 201 proceedings.  *Id.* at 28.  After taking into account the 102-day lead time between import orders and delivery, the ITC noted that "[f]ollowing the [ITC's] announcement of its Section 201 remedy recommendations on December 7, 2001, subject imports in March 2002 (approximately 102 days later) declined to 73,522 short tons,[7] as compared to 161,542 short tons in March 2001 and 156,394 short tons in the preceding month of February 2002." *Id.* (citing Monthly Commerce import statistics, compiled Aug. 22, 2002).  Additionally, the ITC noted that after the President announced the Section 201 tariffs in March 2002, "subject imports in June 2002 (approximately 102 days later) declined to 8,409 short tons, as compared to 185,523 short tons in June 2001." *Id.*  The ITC remarked that by the time Commerce announced its preliminary antidumping duty margins for these investigations in May 2002, "subject imports had already dropped to minimal levels in the U.S. market (34,012 short tons in April 2002 and 12,095 short tons in May 2002)." *Id.*  In a footnote, the ITC recognized another sharp decline in subject

---

[7] A short ton is 2,000 pounds versus a long ton which is 2,240 pounds.  WEBSTER'S 3ʳᴰ NEW INT'L DICTIONARY 1399 (1981).

import volume between December 2001 and January 2002. *Id*. at 30 n.175. This sharp decline followed both the filing of the AD/CVD petitions, in September 2001, and the ITC's affirmative injury finding in the Section 201 investigation, in October 2001. *Id.* The ITC stated that although "both the pending investigations and the Section 201 investigation had an impact on subject import volumes . . . subject imports declined even more dramatically to their lowest levels of the [POI]" following the ITC's Section 201 remedy recommendation in December 2001 and the President's announced remedy in March 2002. *Id.* The ITC noted that although it "[did] not discount the pendency of these [AD/CVD] investigations[,] . . . the record shows that the Section 201 relief fundamentally altered the U.S. market for cold-rolled steel and was the most significant factor in the decline of subject imports during the most recent period examined." *Id.*

Second, the ITC compared import data for hot-rolled and coated steel with import data for the subject cold-rolled steel to support its conclusion that the Section 201 remedy "was the overwhelming factor in the sharp decline in subject imports." *Id.* at 30. The ITC noted that imports of hot-rolled and coated steel were included in the Section 201 proceedings, but were not subject to AD/CVD investigations. *Id.* After examining the import data, the ITC found similar sharp declines in the volume of imports for all three steel products following the imposition of the Section 201 relief. *Id.* The ITC also found that domestic spot prices of cold-rolled, hot-rolled, and coated steel, all of which were subject to the Section 201 tariffs, "exhibited similar trends and similar dramatic increases" after the Section 201 relief was announced. *Id.*

Third, the ITC cited the *Purchasers' Questionnaire Responses* in which "79 of 94 purchasers . . . said that the Section 201 tariffs had reduced subject import volumes, leading, *inter alia*, to higher prices, supply shortages, and some broken or renegotiated contracts." *Id.* at

30 (citing *Purchasers' Questionnaire Responses* (C.R. 355, 369, 377, 380, 397, 399, 401, 408, 419, 961, 962, 966, 968)). The ITC concluded that the Section 201 relief "is having a major impact in the [domestic cold-rolled steel market] and was the overwhelming factor in the sharp decline in subject imports during the most recent period examined." *Id.*

The ITC noted that several developing countries subject to this material injury investigation were exempt from the Section 201 tariffs: Argentina, India, South Africa, Thailand, Turkey, and Venezuela. *Id.* at 27 (citing Annex to Presidential Proclamation 7529, ¶ 11(d)(i)). The ITC highlighted the fact that the Presidential Proclamation stated that these exemptions would be revoked if the developing countries undermined the effectiveness of the safeguard measures by increasing exports to the United States. *Id.*

After discussing Section 201's influence on the domestic industry, the ITC addressed the effects that the initiation of these AD/CVD investigations had on the subject imports during the POI. *Id.* at 31. The ITC stated that it has been given discretion "to look to the time period that provides probative, reliable data 'in as contemporaneous a time frame as possible.'" *Id.* (quoting *Saarstahl*, 858 F. Supp. at 200). The ITC noted that it must consider "whether any change in the volume, price effects, or impact of imports since the filing of the petition in an investigation is related to the pendency of the investigation," and, if so, it may "reduce the weight accorded to data for the period after the filing of the petition" in making its determination of material injury. *Id.* (citing 19 U.S.C. § 1677(7)(I)). The ITC also noted that the presumption that a change in import data is related to the pendency of the investigation is rebuttable. *Id.* (citing the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. DOC. NO. 94-103, at 854 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4186). The ITC

reiterated its earlier finding "that the Section 201 relief was a major factor in the sharp decline in subject imports, notwithstanding any effects attributable to the pendency of the [AD/CVD] petition." *Id.*

Having found that the change in import data in 2002 was a result of the Section 201 proceedings, the ITC rejected the petitioners' arguments to accord less weight to the post-petition data under § 1677(7)(I). *Id.* at 31. Thus, the ITC considered data from the full POI: January 1999 to June 2002. *Id.* The ITC compared the most recent volume data with data from the earlier part of the POI. *Id.* at 33. The ITC cited the following volume data regarding the earlier part of the POI: cumulative subject imports totaled approximately 2.48 million short tons in 1999; 1.68 million short tons in 2000; and 2.40 million short tons in 2001. *Id.* at 32. The merchant market[8] share of the subject imports was 13.6% in 1999, 9.2% in 2000, and 15.2% in 2001 "as apparent U.S. consumption declined." *Id.* Examining the total market, the ITC found that subject imports' market share was 6.2% in 1999, 4.2% in 2000, and 6.7% in 2001. *Id.* In comparing recent 2002 data, the ITC noted that in the first half of 2002, subject imports totaled 460,875 short tons, compared to 1.04 million short tons in the first half of 2001. *Id.* The ITC found that the merchant market share of the subject imports dropped to 6.7% in the first half of 2002 versus 15.0% in the first half of 2001. *Id.* Further, the ITC ascertained that cumulated subject imports accounted for 2.6% of the total market in the first half of 2002, compared with

---

[8] "Selling in the merchant market refers to sales of the domestic like product to unrelated customers," SAA at 852, 1994 U.S.C.C.A.N. at 4185, as opposed to captive production which occurs when "domestic producers internally transfer significant production of the domestic like product for the production of a downstream article," 19 U.S.C. § 1677(7)(C)(iv). In this case, the ITC found that "all the elements of the captive production provision" were met; thus, the ITC focused "primarily on the merchant market . . . in determining market share and the factors affecting financial performance." *Cold-Rolled I* at 23; 19 U.S.C. § 1677(7)(C)(iv).

6.2% in the first half of 2001. *Id*. The ITC also found that in the first half of 2002, the volume

of subject imports was equivalent to 2.7% of domestic production compared to 7.0% in the first

half of 2001. *Id*. at 33. The ITC noted an accelerated decline in the volume of subject imports in

the second quater of 2002. *Id.* at 32.

In conclusion, the ITC stated that although there were higher subject import volumes

early in the POI, the ITC found that "the present volume of subject imports is not significant, in

absolute terms or relative to domestic consumption or production." *Id.* at 33.

PARTIES' CONTENTIONS

**A. Nucor's Contentions.**

Nucor contends that the ITC's volume determination is unsupported by substantial

evidence because the ITC incorrectly concluded that the Section 201 proceedings were the

overwhelming factor in the decline of subject imports and unreasonably dismissed evidence that

showed that the pending AD/CVD investigations caused the decline. (Nucor's Br. at 16, 22-23.)

Nucor contends that because these AD/CVD investigations caused the decline in subject import

volume, the ITC should have discounted the post-petition data (data after September 2001) and

focused on data from 1999 to 2001 which showed that the volume of subject imports was

significant. (*Id*. at 27.)

Nucor contends that the ITC's conclusion that the Section 201 relief was the

"overwhelming factor" in the decline of subject imports is unsupported by substantial evidence.

(*Id.* at 16.) First, Nucor asserts that the ITC's "correlation between the sharp decline in subject

imports and key events in the Section 201 proceedings" is "deficient and arbitrarily selective."

(*Id.*) Nucor contends that the Section 201 proceedings were initiated in June 2001, however,

imports did not react to this request: "indeed, [import volumes] continued to increase in the fall of 2001." (*Id.*)  Nucor asserts that import volumes did dramatically decline in the "first month that would reflect decisions on import purchases that would be influenced" after the AD/CVD investigations were initiated. (*Id.*)  Taking into account the 102-day lead time, Nucor asserts that the volume of subject imports should have responded to the AD/CVD investigations in January 2002. (*Id.* at 17.)  Nucor contends that "[t]his is exactly what happened." (*Id.*)  Nucor asserts that the ITC acknowledged this "sharp decline" in volume in January 2002. (*Id.* (citing *Cold-Rolled I* at 30 n.175).)  However, Nucor contends that the ITC dismissed the correlation between this decline and the AD/CVD petitions and instead placed importance on the Section 201 proceedings. (*Id.*)

Nucor contends that the ITC's correlation between key events and volume decline is further undermined by the "very real distinctions between" Section 201 relief and AD/CVD relief. (*Id.*)  Nucor contends that relief under Section 201 is prospective with no possibility of retroactive duties, does not occur within an enforceable time frame, and has a delayed effective date. (*Id.* at 17-18.)  Nucor contends that the ITC's failure to take into account the differences between the AD/CVD and the Section 201 relief was unreasonable. (*Id.* at 19.)  Nucor argues that these differences "mean that importers would have been unlikely to react immediately and uniformly to the [ITC's Section] 201 remedy recommendation." (*Id.* at 18.)  Nucor contends that AD/CVD investigations, however, have an immediate effect on imports. (*Id.*)  Nucor contends that because of the potential for retroactively imposed duties, importers typically react immediately to the initiation of an AD/CVD investigation by decreasing their purchases. (*Id.* at 19 (citing 19 U.S.C. §§ 1673b(e), 1673d(a)(3), 1673d(c)(3-4)).)  Nucor contends that importers

would not have reacted to the Section 201 relief until the tariffs took effect, at least 45 days after the President's announcement in March 2002. (*Id.*) Nucor asserts that if the 102-day lead time between order and entry is applied, imports would have begun to decline in response to the Section 201 tariffs around June 15, 2002. (*Id.*) However, Nucor asserts that the imports had already dramatically declined in April and May 2002. (*Id.*) Nucor contends that the import decline in 2002 "was far greater than could have been caused by the Section 201 remedy alone." (*Id.*)

Second, Nucor contends that the ITC's volume trend comparisons of cold-rolled, hot-rolled, and coated steel imports do not support the conclusion that the Section 201 proceedings were the overwhelming factor in the decline in the volume of subject imports. (*Id*. at 21.) Nucor asserts that the ITC's own comparisons show that the decline in cold-rolled steel imports was significantly greater than the decline in imports of hot-rolled and coated steel. (*Id.*) Nucor asserts that the ITC's figures demonstrate that the decline in cold-rolled steel was 47.7% greater than the decline of hot-rolled steel imports, and 14.9% greater than the decline in coated steel imports. (*Id.* (citing *Cold-Rolled I* at 29).) Nucor contends that this significant difference indicates that other factors caused the greater decline in cold-rolled imports, namely the initiation of these AD/CVD investigations. (*Id.*)

Third, Nucor identifies two pieces of record evidence that it claims support its contention that the AD/CVD investigations had a more significant effect on the decline in subject imports in 2002 than the Section 201 proceedings:

1. Nucor notes that six developing countries that were subject to these AD/CVD investigations were exempt from the Section 201 tariffs: Argentina, India, South Africa,

Thailand, Turkey, and Venezuela.  (*Id.* at 20 (citing *Cold-Rolled I* at 27).)  Nucor contends that

an analysis of the import volume trends from those exempt countries reveals that "something

other than . . . the Section 201 remedy" was affecting import volume.  (*Id.*)  Nucor asserts that

subject imports from the six exempt countries totaled 191,988 tons in the first half of 2001,

compared to only 22,410 tons in the first half of 2002.  (*Id.* (citing *Cold-Rolled I* at 35 n.210).)

Further, Nucor notes that by the second quarter of 2002, imports were only 608 tons, "an

unmitigated exit from the market."  (*Id.* at 20-21.)  Nucor contends that the Section 201 remedy

could not have been solely responsible for this dramatic decline in these imports because the

countries were exempt from the Section 201 tariffs.  (*Id.* at 21.)  Nucor asserts that the "more

logical conclusion" is that subject imports declined because of the initiation of the AD/CVD

investigations.  (*Id.*)

     2.  Nucor asserts that the ITC unreasonably dismissed an "econometric analysis that

confirmed the impact" of the AD/CVD investigations on subject imports.  (*Id.* at 24.)  According

to Nucor, the ITC rejected an econometric analysis submitted by Nucor that contained two

important data comparisons: (1) imports from countries subject to the Section 201 tariffs and

subject to these AD/CVD investigations compared to imports from countries only subject to the

Section 201 tariffs; (2) imports from countries only subject these AD/CVD investigations

compared to imports from countries that were subject to neither these AD/CVD investigations

nor the Section 201 tariffs.  (*Id.*)  Further, Nucor contends that the econometric analysis

highlighted the fact that imports from countries covered by the Section 201 tariffs but not subject

to these AD/CVD investigations <u>increased</u> in the first half of 2002 by 22.0% compared to the

first half of 2001, and <u>increased</u> in the second quarter of 2002 by 67.66% compared to the second

quarter of 2001.  (*Id.* at 21 (citing *Certain Cold-Rolled Steel Products, Staff Report to the Commission*, Invs. Nos. 701-TA-422-425, 731-TA-964-983 (Final) (Aug. 14, 2002), *amended and corrected by* Mem. INV-Z-134 ("Final Staff Report") App. J at J-5 (C.R. 351, 318, 350)).)

Nucor contends that under the ITC's rationale, the Section 201 proceedings should have had the same impact on cold-rolled steel imports from subject and non-subject countries.  (*Id.* at 21-22.)

Nucor contends that the ITC's refusal to address this non-subject country data because of the "very small volume of non-subject imports" is unreasonable.  (*Id.* at 22 (quoting *Cold-Rolled I* at 35 n.210).)  Nucor contends that non-subject cold-rolled steel imports accounted for 4.5% of the open market consumption by volume, an amount "not reasonably . . . described as 'very small.'"  (*Id.*)  Nucor contends that its econometric analysis "isolated the effect of the filing of the anti-dumping and countervailing duty [petitions] and differentiated the impact of the filing of those [petitions] from the impact of the Section 201 investigation . . . us[ing] standard econometric modeling methods well known to the [ITC]."[9]  (*Id.* at 25 (citing J. Prehr'g Br. of Nucor Corp., Steel Dynamics, Inc., WCI Steel, and Weirton Steel Corp. ("Prehr'g Br. of Nucor et al.") Ex. 2 at 12 (P.R. 128) (C.R. 259)).)  Nucor argues that the ITC failed to provide any meaningful discussion of this econometric analysis in its final determinations.  (*Id.* at 26-27.)  Nucor contends that the Court has held that the ITC has "has a duty to consider [parties'] arguments and

---

[9] Nucor presents the following chart to illustrate the comparisons:

**Cold-Rolled Imports (Sept. 2001 - April 2002)**

| Imports Subject To: | % Change |
|---|---|
| AD/CVD + 201 Duties | -79% |
| 201 Duties Only | -12.7% |
| AD/CVD Duties Only | -97.5% |
| Neither | +98.9% |

(*Id.* at 25 (citing Prehr'g Br. of Nucor et al. Ex. 2 at 9).)

analyses throughly, and to articulate a satisfactory explanation for its determination." (*Id*. at 26 (citing *Altx*, 167 F. Supp. 2d at 1359-1360).)  Nucor contends that the ITC's failure to adequately address the econometric analysis is sufficient basis to find that the ITC's determination is unsupported by substantial evidence because, if the ITC had addressed its econometric analysis, Nucor claims that the evidence would have demonstrated that the volume of subject imports declined because of these AD/CVD investigations. (*Id*. at 26-27.)

Nucor concludes that the record demonstrates that the AD/CVD investigations had a more significant impact on the subject import data in 2002; thus, the ITC should have exercised its discretion to discount the post-petition data. (*Id*. at 23.)

Alternatively, even if 2002 data are considered, Nucor contends that the ITC's determination is not supported by substantial evidence because the subject imports occupied a significant percentage of market share in the first half of 2002. (*Id.* at 27.)  Nucor contends that if market share is examined in terms of volume, subject imports held an open-market share of 11.2% even in the first quarter of 2002. (*Id.* (citing Final Staff Report at IV-29).)  Nucor contends that in previous investigations, the ITC has determined that a lower market share was "significant." (*Id.* at 27-28 (citing *Certain Cut-to-Length Steel Plate from France, India, Indonesia, Italy, Japan, and Korea*, Invs. Nos. 701-TA-387-391, 731-TA-816-821 (Final) USITC Pub. 3273 at 22 (Jan. 2000); *Hot Rolled Steel Products from Argentina and South Africa*, Invs. Nos. 701-TA-404, 731-TA-898, 905 (Final) USITC Pub. 3446 at 19-20 (Aug. 2001)).)  Nucor contends that the ITC unreasonably failed to distinguish these prior determinations from the present investigations. (*Id.* at 27-28.)  Nucor concludes that the Court should find that the ITC's volume determination is unsupported by substantial evidence. (*Id.* at 28.)

**B. Domestic Integrated Producers' Contentions.**

Domestic Integrated Producers contend that the ITC's determination that the volume of subject imports was not significant during the POI is not supported by substantial evidence. (Domestic Integrated Producers' Br. at 29.)  Domestic Integrated Producers assert that the ITC should have discounted the data after the AD/CVD petitions were filed in September 2001 because record evidence shows that the pendency of these AD/CVD investigations was the most significant factor affecting the volume of subject imports.  (*Id.* at 31.)  Although Domestic Integrated Producers acknowledge that the ITC has discretion under § 1677(7)(I) to discount post-petition data, they contend that the ITC abused its discretion when it refused to accord less weight to data from 2002 because substantial evidence does not support the ITC's finding that the Section 201 proceedings were the overwhelming factor in the decline of subject imports in 2002.  (*Id.* at 31-32.)  Domestic Integrated Producers contend that the ITC should have focused on volume data for 1999 through 2001 that demonstrate that the volume of subject imports during that time period of the investigation was significant.  (*Id.* at 29-30.)

Domestic Integrated Producers contend that the ITC's decision not to discount post-petition data was based on the ITC's finding that the Section 201 proceedings were the overwhelming factor in the decline in subject imports in 2002.  (*Id*. at 32.)  Domestic Integrated Producers contend that this finding is not supported by substantial evidence.  (*Id*.)  Specifically, Domestic Integrated Producers contend that the ITC based its finding on three faulty premises: (1) a correlation between declines in monthly volume data for subject imports and key dates in the Section 201 process; (2) a comparison of the volume trend of cold-rolled steel imports with the volume trends for hot-rolled and coated steel imports; (3) the questionnaire responses from a

majority of purchasers which indicated that the Section 201 relief had reduced import volume. (*Id.* (citing *Cold-Rolled I* at 28-30).) Domestic Integrated Producers argue that these premises fail to provide substantial evidence to support the ITC's conclusion that the Section 201 relief was the overwhelming factor in the decline of subject imports. (*Id.*)

First, Domestic Integrated Producers contend that the ITC's correlation between declines in monthly subject import volume and key events in the Section 201 proceedings is undermined by the fact that "the most significant decline in subject import volume occurred between December 2001 and January 2002." (*Id.* at 33.) Domestic Integrated Producers contend that this volume decline occurred "before the Section 201 determination could have had any effect" in the market, and, instead, was as a result of the filing of the AD/CVD petitions in September 2001. (*Id.* at 32.) Domestic Integrated Producers assert that this volume decline between December 2001 and January 2002, is significantly greater than the decline between February and March 2002 "cited by the [ITC] as evidence of the impact of the announcement of the Section 201 remedy recommendations." (*Id.* at 34-35.) Domestic Integrated Producers contend that the total decline in import volume over the five months that followed the ITC's Section 201 remedy recommendation and the President's announcement was "still less than the one-month decline [from December 2001 to January 2002] that can clearly be attributed to the filing of the petitions." (*Id.* at 36.) Domestic Integrated Producers argue that the December to January decline demonstrates that the AD/CVD petitions had a more significant effect on imports than the Section 201 proceedings. (*Id.*) Domestic Integrated Producers contend that the ITC acknowledged the December to January decline in volume, but failed to adequately analyze the data. (*Id.* at 35 (citing *Cold-Rolled I* at 30 n.175).) Domestic Integrated Producers contend that

the ITC's failure to fully address the December to January volume decline in its determinations "violates the statutory requirement to address all relevant arguments made by interested parties." (*Id.* at 37 (citing 19 U.S.C. § 1677f(i)(3)(B)).)

Second, Domestic Integrated Producers challenge the ITC's comparison of subject import volume trends with hot-rolled and coated steel import volume trends. (*Id.* at 38.) Domestic Integrated Producers contend that it is unclear if the hot-rolled and coated steel import data is on the record because the ITC did not provide adequate citations to the information. (*Id.* at 39.) Domestic Integrated Producers assert that the ITC's citation to "official Commerce statistics" is insufficient. (*Id.* (citing *Cold-Rolled I* at 29 n.171).) Domestic Integrated Producers assert that without accurate citations, "it is impossible to evaluate whether the [ITC's] determination is based on substantial evidence." (*Id.* at 40.) Domestic Integrated Producers also contend that the ITC failed to release these "official Commerce statistics" to the parties and failed to provide the interested parties with an opportunity to comment on the data as required under § 1677m(g). (*Id.* at 41.)

Domestic Integrated Producers assert that the ITC's analysis of hot-rolled steel imports is "particularly troubling" because the ITC excluded Korean imports from its analysis "even though Korea was one of the countries covered by the Section 201 tariffs." (*Id.* at 42.) Domestic Integrated Producers note that the ITC explained that this was "'pursuant to an exclusion request granted to POSCO, although the exclusion was not country-specific.'" (*Id.* (quoting *Cold-Rolled I* at 29 n.171).) However, Domestic Integrated Producers note that the ITC did not provide any other information regarding this exclusion. (*Id.*) Domestic Integrated Producers contend that the ITC's exclusion of Korean imports from the hot-rolled steel data "is inexplicable and

indefensible." (*Id.* at 43.)  Domestic Integrated Producers contend that if the ITC had <u>included</u>

Korean imports in its analysis of hot-rolled imports, the comparison between subject import

volumes and hot-rolled import volumes "would have been revealed to be grossly dissimilar."

(*Id.* at 44.)  Domestic Integrated Producers contend that this dissimilarity further supports their

assertion that "the Section 201 remedy was not the 'overwhelming factor' in subject import

decline." (*Id.*)

Domestic Integrated Producers contend that the ITC's comparison of cold-rolled, hot-

rolled, and coated steel is irrational because it contradicts the ITC's reasoning elsewhere in its

final determinations.  (*Id*. at 46.)  Domestic Integrated Producers note that in its comparison, the

ITC excluded hot-rolled and coated steel import data from countries that were exempt from the

Section 201 tariffs.  (*Id*.)  Domestic Integrated Producers note that earlier in its determination, the

ITC stated that subject imports from <u>all</u> countries (including those exempt from Section 201

tariffs) would have been affected by the ITC's Section 201 remedy recommendation in December

2001 because the exemptions were not announced until the President's Proclamation in March

2002.  (*Id.* (citing *Cold-Rolled I* at 35 n.210).)  Domestic Integrated Producers question why the

ITC would note that the ITC's recommendations in December 2001 affected <u>all</u> cold-rolled steel

imports, but then not include import data for <u>all</u> hot-rolled and coated steel imports in its volume

trends comparison.  (*Id.* at 45-46.)  Domestic Integrated Producers contend that the ITC's

exclusion of import volume data from exempt countries in its volume trends comparison of steel

imports was irrational and not supported by substantial evidence.  (*Id.* at 46.)  Domestic

Integrated Producers contend that if the ITC had looked at volume trends for <u>all</u> hot-rolled and

coated steel imports, including imports from countries exempt from the Section 201 tariffs, the

ITC would have found that hot-rolled and coated steel imports initially increased in 2002, whereas imports of cold-rolled steel decreased. (*Id.* at 48 (citing *Hearing Transcript, Certain Cold-Rolled Steel Products from Argentina, Australia, Belgium, Brazil, China, France, Germany, India, Japan, Korea, The Netherlands, New Zealand, Russia, South Africa, Spain, Sweden, Taiwan, Thailand, Turkey, and Venezuela*, Invs. Nos. 701-TA-422–425, 731-TA-964–983 (Final) (July 18, 2002) ("Hr'g Tr.") at 57 (P.R. 157); J. Posthr'g Br. of Nucor Corp., Steel Dynamics, Inc., WCI Steel, Inc., and Weirton Steel Corp. ("Posthr'g Br. of Nucor et al.") at 15 (P.R. 128) (C.R. 291)).) Domestic Integrated Producers contend that the ITC's comparison of steel imports is flawed because the data, when taken as a whole, shows that the subject imports of cold-rolled steel "diverged from the trends for other flat-rolled products subject to the Section 201 remedy." (*Id.*)

In their third challenge, Domestic Integrated Producers contend that the ITC's reliance on the *Purchasers' Questionnaire Responses* to support its conclusion that the Section 201 proceedings were the overwhelming factor in the decline in subject imports is not supported by substantial evidence. (*Id.* at 49.) Domestic Integrated Producers note that the ITC found that the 79 out of 94 purchasers replied that the Section 201 tariffs had reduced subject import volumes. (*Id.* (citing *Cold-Rolled I* at 30).) However, Domestic Integrated Producers contend that the producers responded that both the Section 201 tariffs and these AD/CVD investigations reduced subject import volumes. (*Id.* at 50 (citing *Cold-Rolled I* at 30 n.174; Final Staff Report at II-3).) Domestic Integrated Producers assert that this evidence undercuts the ITC's conclusion that the Section 201 remedy was the overwhelming factor in the decline in subject import volume. (*Id.*)

Domestic Integrated Producers also contend that the ITC failed to adequately address

record evidence that demonstrated that subject imports from the developing countries exempt from the Section 201 tariffs declined by 99.58% in the second quarter of 2002 as compared to the second quarter of 2001.  (*Id.* at 44-45 (citing Final Staff Report at Table J-2).)  Domestic Integrated Producers contend that this evidence supports its contention that the AD/CVD investigations had a greater effect on subject imports than the Section 201 proceedings.  (*Id.* at 45.)

Lastly, Domestic Integrated Producers contend that, contrary to its obligation under § 1677f(i)(3)(B), the ITC failed to address several pieces of evidence demonstrating that the Section 201 proceedings were not the overwhelming factor in the decline of subject imports, including: (1) a June 2002 report by Metal Bulletin Research stating that imports had regained competitiveness; (2) a statement from a foreign producer indicating that the Section 201 tariffs would not affect the market; (3) a news article reporting a statement from Russian cold-rolled steel producers that they would continue to sell to U.S. customers unless antidumping duties were imposed.  (*Id.* at 50-51 (citing Posthr'g Br. of Bethlehem Steel Corp., National Steel Corp., and U.S. Steel Corp. ("Domestic Integrated Producers' Posthr'g Br.") Exs. 12, 13, 54 (P.R. 193) (C.R. 294)).)  Domestic Integrated Producers contend that the ITC's failure to address this evidence is reversible error.  (*Id.*)

Domestic Integrated Producers conclude that the record does not provide substantial evidence to support the ITC's conclusion that the Section 201 remedy was the overwhelming factor in the decline in subject import volumes.  (*Id.* at 52.)  Rather, Domestic Integrated Producers argue that the record evidence supports the finding that the AD/CVD investigations had a significant effect on subject imports; thus, the ITC's refusal to accord less weight to the

post-petition data was an abuse of discretion. (*Id*.) Had the ITC discounted the post-petition

2002 data, Domestic Integrated Producers contend that the record evidence demonstrates that

subject import volumes were significant during the earlier part of the POI. (*Id*.)

## C. Defendant's Contentions.

Defendant contends that the ITC's finding that the volume of subject imports was not

significant is supported by substantial evidence. (Def.'s Br. at 38.) Defendant asserts that

Plaintiffs do <u>not</u> argue that the subject volume of imports in 2002 was significant; rather,

according to Defendant, Plaintiffs' argument is that the 2002 data should have been discounted

and only the data from 1999-2001 should have been evaluated in the ITC's volume analysis.

(*Id*.) Defendant contends that the ITC properly examined the entire POI including the post-

petition data from 2002. (*Id*.)

First, Defendant asserts that Plaintiffs' selective presentation of the record to the Court is

evidence that Plaintiffs are asking this Court to conduct *de novo* review. (*Id*. at 45.) Defendant

contends that Plaintiffs make their volume arguments only using volume data from 1999 to 2001.

(*Id*. at 44.) Defendant acknowledges that the ITC emphasized the more recent data, but contends

that the ITC examined the entire investigation period and specifically examined the volume of

subject imports from 1999 through the first half of 2002. (*Id*. at 39, 42.) Additionally,

Defendant asserts that Plaintiffs' discussion of the volume data is incomplete because they only

reference import volume in terms of the merchant market, whereas the ITC's analysis focused on

the merchant market while also considering the total market data. (*Id*. at 44-45 (citing *Cold-*

*Rolled I* at 30; SAA at 852, 1994 U.S.C.C.A.N. at 4185).) Defendant contends that the Court

should not be persuaded by Plaintiffs' selective presentation of the record to re-weigh the

evidence that was before the ITC, but should examine the ITC's determination to see if it is legally defective. (*Id.* at 45-46 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Dastech Int'l, Inc. v. United States*, 963 F. Supp. 1220, 1222 (Ct. Int'l Trade 1997)).)

Defendant contends that under § 1677(7), the ITC has the discretion to disregard post-petition data, but notes that "[n]othing in the statute compel[s] the [ITC] to exercise its discretion." (*Id.* at 48.) Defendant argues that there is no presumption that pending AD/CVD investigations affect import data. (*Id.* at 49.) Defendant contends that the ITC properly considered the post-petition data because the ITC found that the Section 201 proceedings were the most significant factor in the decline in the volume of subject imports. (*Id*. at 49-50.)

Defendant contends that substantial evidence in the record supports the ITC's finding that the Section 201 proceedings had an overwhelming impact on subject imports. (*Id.* at 50.) Defendant contends that the ITC made specific findings regarding the correlation between the decline in import volume and key events in the Section 201 process. (*Id.* at 50-51.) Defendant highlights the ITC's factual findings regarding the dramatic decline in the volume of subject imports after the ITC announced its Section 201 remedy recommendations and after the President announced the Section 201 tariffs. (*Id.* at 51-52.)

Defendant discounts Plaintiffs' focus on the decline in imports from December 2001 to January 2002, after the AD/CVD petitions were filed in this case. (*Id.* at 53-55.) Defendant notes that Plaintiffs fail to mention that the December 2001 import levels were "anomalously high." (*Id.* at 54.) Defendant asserts that when the low import levels in January 2002 are viewed in context of the entire record, the decline "is far less significant" than Plaintiffs contend. (*Id.*) Additionally, Defendant notes that the ITC recognized this "sharp decline" in January 2002;

however, Defendant contends that the ITC properly focused instead on the more dramatic

declines following key events in the Section 201 proceedings. (*Id.* at 52.) Unlike the Plaintiffs'

selective presentation of the December to January decline in isolation, Defendant notes that the

ITC took into account the various market shifts in makings its correlations between key events

and the decline in import volume to present a more accurate picture of the domestic market. (*Id.*

at 55-56.)

Defendant asserts that Plaintiffs' argument that the pending AD/CVD investigations had

a significant impact on volume is undermined considering that the volume of subject imports

increased slightly in February 2002, well after the AD/CVD petitions were filed. (*Id.* at 56.)

Further, Defendant notes that the provisional antidumping duties in these investigations were not

even announced until May 2002; thus, any effect that those provisional duties would have had on

the domestic market would not have been felt until the end of June 2002, after the POI ended.

(*Id.* at 49-50.)

Next, Defendant contends that the ITC's volume trends comparison between subject

imports, hot-rolled steel imports, and coated steel imports was reasonable. (*Id.* at 57.) Defendant

asserts that the ITC properly compared these volume trends because all three products were

subject to the Section 201 tariffs. (*Id.*) Defendant addresses Domestic Integrated Producers'

contention that the data is from an unknown source by stating that the data, footnoted as "from

official Commerce statistics," are "publically available in various forms, including the [ITC's]

Trade Dataweb online service." (*Id.* at 58-59 (citing *Cold-Rolled I* at 29 n.171).) Defendant

contends that the hot-rolled and coated steel volume data were part of an ongoing discussion on

the record and Domestic Integrated Producers "have had ample opportunity . . . to comment" on

this data during the administrative process.  (*Id.* at 59-61 (citing Prehr'g Br. of Nucor et al. Ex. 2 at 8 (P.R. 128) (C.R. 259); 08/26/02 email from Mark Paulson to Karen Taylor and Commission staff (C.R. 915); Worksheets Karen Taylor – Hot-Rolled and Corrosion Resistant Imports (Aug. 21, 2002) (C.R. 813).)  Defendant argues that Plaintiffs cannot now claim that the ITC's determination is deficient because they did not comment on this data during the administrative process.  (*Id*. at 61.)

As to the exclusion of certain data from Korea in the ITC's volume trends comparison, Defendant contends that the ITC properly excluded all Korean hot-rolled data.  (*Id*.)  Defendant contends that the ITC's exclusion of Korean data was reasonable because UPI, a joint venture between a domestic producer and a Korean producer, had obtained an exclusion from the Section 201 tariffs for a certain quantity of hot-rolled imports.  (*Id*.)  Defendant contends that the goal of ITC's comparison was to "observe trends in hot-rolled steel imports" and that this goal was better achieved by excluding all Korean data even though the Section 201 exclusion was for UPI only. (*Id.* at 62.)  Defendant also contends that the ITC's choice to compare <u>all</u> cold-rolled steel imports subject to these investigations with only those hot-rolled and coated imports from countries subject to Section 201 tariffs was reasonable because it supported the objective of the ITC's analysis: "to compare the impact of the [AD/CVD] petitions and the impact of the Section 201 remedy."  (*Id.* at 64.)  Defendant contends that this choice is not contrary to the ITC's prior statements in *Cold-Rolled I* regarding the exempt countries.  (*Id*.)  Further, Defendant contends that the volume trend comparisons were but one part of the ITC's overall analysis of the Section 201 proceedings' effect on subject imports.  (*Id.*)

Defendant points to the *Purchaser Questionnaire Responses* as additional support for the

ITC's finding that the Section 201 proceedings were the overwhelming factor in the decline of subject imports. (*Id.* at 66.) Defendant notes that the ITC found that a majority of purchasers indicated that the Section 201 investigation affected the volume of subject imports. (*Id.* (citing *Cold-Rolled I* at 39-40).) Defendant contends that the ITC's finding is further supported because more purchasers (79 out of 94) responded that the Section 201 investigation reduced import volumes, than purchasers who responded that the pendency of these AD/CVD investigations affected imports (70 out of 93). (*Id.*) Defendant also notes that during the administrative process, Plaintiffs acknowledged that "Section 201 has been a significant factor in improved market conditions for the industry." (*Id.* at 67 (quoting *Cold-Rolled I* at 30 n.174, in turn quoting Prehr'g Br. of Bethlehem Steel Corp., National Steel Corp., and U.S. Steel Corp. (Domestic Integrated Producers' Prehr'g Br.") at 50-51 (P.R. 130) (C.R. 251)).)

Regarding Plaintiffs' contentions about the developing countries that were exempt from the Section 201 tariffs, Defendant contends that Plaintiffs are attempting to "mask a request for *de novo* review as an assertion that their argument below was not addressed." (*Id.*) Defendant contends that the ITC did address Plaintiffs' argument that imports from the six developing countries exempt from Section 201 relief continued to decline during the POI. (*Id.* at 67-68.) Contrary to Plaintiffs' contention that this decline was the result of the impact of the AD/CVD petitions, Defendant asserts, as the ITC discussed in *Cold-Rolled I*, that the developing countries did not know that they would be exempt from Section 201 tariffs until after the President's announcement in March 2002. (*Id.* at 68.) Thus, during the first half of 2002, imports from these developing countries would have reacted as though they were going to be subject to the Section 201 tariffs. (*Id.*) Further, Defendant asserts that the ITC is not obligated to address

every argument on the record. (*Id.* at 67-68 (citing *Granges Metallverken v. United States*, 716

F. Supp. 17, 24 (Ct. Int'l Trade 1989)).)

Defendant discounts Nucor's contentions that the ITC failed to take into consideration the

econometric analysis submitted during the investigations regarding the impact of the Section 201

remedy. (*Id.* at 78-79.) Contrary to Nucor's contention, Defendant asserts that this Court has not

required the ITC to provide an explanation if it rejects a party's submitted study. (*Id.* at 80-81.)

Rather, Defendant contends that the Court has previously required an explanation from the ITC

only because the ITC's final conclusion conflicted with an ITC staff report. (*Id.* at 81 (citing

*Altx*, 167 F. Supp. 2d at 1359-1360).) Defendant contends that such an internal inconsistency is

not present in this case simply because the ITC's conclusion differs from the party's submitted

econometric analysis. (*Id.*)

Defendant argues that Nucor's alternative contention that the subject imports occupied a

significant percentage of market share by volume throughout the POI is without merit. (*Id*. at

46.) Defendant asserts that Nucor ignores the fact that ITC determinations are *sui generis* when

Nucor cites prior ITC determinations as support for its alternative contention. (*Id.*) Defendant

contends that Nucor's comparison of the percentage of market share in this case with the

percentage found in other ITC determinations is without merit because the courts have long

recognized that ITC determinations "involve[] the unique interaction of many variables and,

therefore, a particular circumstance in a prior [ITC] investigation is irrelevant in a subsequent

investigation." (*Id.*) Defendant contends that the ITC is not required to explain contrasting

findings in prior investigations; rather, the ITC is only required to provide an explanation if it

deviates from a long-standing practice. (*Id.* at 47.) Defendant contends that Nucor fails to

present any evidence that suggests that the ITC has deviated from a long-standing practice in its volume analysis in this case.  (*Id*.)

**D.  Defendant-Intervenors' Contentions.**

Defendant-Intervenors contend that the ITC's finding that the subject import volume was not significant is supported by substantial evidence.  (Def.-Intvs.' Br. at 26.)  Defendant-Intervenors contend that the evidence demonstrates that the volume of subject imports declined to minuscule levels by the end of the POI.  (*Id*.)  Defendant-Intervenors assert that Plaintiffs have not provided any factual basis to contradict the ITC's finding that the volume of subject imports was not significant by the end of the POI.  (*Id*. at 27.)  Defendant-Intervenors contend that the subject imports' market share "remained essentially flat over the [POI] before declining radically in 2002."  (*Id*. at 28 (citing *Cold-Rolled I* at 32-33).)  Based on these facts, Defendant-Intervenors assert that it was reasonable for the ITC to find that the volume of subject imports was insignificant.  (*Id*. at 29.)

First, contrary to Plaintiffs' contentions that the ITC should have disregarded post-petition data, Defendant-Intervenors assert that the law grants the ITC the discretion to discount post-petition data.  (*Id*. at 16.)  Defendant-Intervenors emphasize that the statute is written permissively, instructing that the ITC "may" reduce the weight accorded to post-petition data. (*Id*.)  Defendant-Intervenors contend that the SAA and case law support the ITC's discretion to accord less weight to post-petition data and "contemplate circumstances in which it would be inappropriate" to do so.  (*Id*. (citing SAA at 854; *Altex*, 167 F. Supp. 2d at 1361 n.10; *Comm. for Fair Beam Imps. v. United States*, No. 02-00531, 2003 Ct. Int'l Trade LEXIS 79, at *46-*47 (Ct. Int'l Trade 2003)).)  Defendant-Intervenors contend that the ITC's decision in this case to

consider the 2002 post-petition data was supported by substantial evidence and was in accordance with law.  (*Id.* at 18.)

Contrary to Plaintiffs' contentions, Defendant-Intervenors assert that the ITC, in fact, considered both the effect of the AD/CVD petitions and the effect of the Section 201 proceedings on subject imports.  (*Id.* at 29-30 (citing *Cold-Rolled I* at 28).)  Defendant-Intervenors contend that after considering both, the ITC reasonably determined that the Section 201 proceedings had an "overwhelming" effect.  (*Id.* at 30.)  Defendant-Intervenors contend that it was reasonable for the ITC to attribute the decline in import volume that occurred between December 2001 and January 2002 to both the filing of the AD/CVD petitions and the Section 201 proceedings.  (*Id.* at 31-32 (citing *Cold-Rolled I* at 30 n.175).)  Defendant-Intervenors note that the ITC found "subsequent dramatic declines [in imports] following each successive step in the Section 201 proceeding"; thus, it was reasonable for the ITC to attribute the December to January decline more to the Section 201 proceedings than to the filing of the AD/CVD petitions.  (*Id.* at 32.)

Defendant-Intervenors contend that foreign producers and importers had an immediate incentive to stop importing subject imports in response to the Section 201 investigation.  (*Id.* at 33.)  Defendant-Intervenors contend that the same market uncertainty that is present after the initiation of an AD/CVD investigation "is common after the commencement of a Section 201 investigation."  (*Id.*)  Defendant-Intervenors also assert that because of the 102-day lead time between sale and entry, importers and foreign producers "needed to immediately anticipate import restrictions" after the ITC made its Section 201 recommendation in December 2001.  (*Id.*)

Defendant-Intervenors address Plaintiffs' contention regarding the ITC's comparison of hot-rolled, coated, and cold-rolled steel import trends.  (*Id.* at 36.)  Defendant-Intervenors assert

that the ITC's comparison was a valid demonstration of the effect of the Section 201

proceedings. (*Id*.) Contrary to Plaintiffs' assertion that the comparison was based on

information not in the record, Defendant-Intervenors contend that the "record" is broadly defined

to include all information that is before the ITC up to the time of its decision. (*Id.* at 37 (citing

19 U.S.C. § 1516a(b)(2)(A); *Beker Indus. Corp. v. United States*, 7 Ct. Int'l Trade 313, 314-315

(1984)).) Defendant-Intervenors contend that the import data used by the ITC were taken from

tables created by ITC staff. (*Id.* at 37 (citing Worksheets Karen Taylor - Hot Rolled and

Corrosion Resistant Imports (C.R. at 868); Staff Notes George Deyman (C.R. 907)).) Defendant-

Intervenors contend that the data were taken from these staff notes and merely restated "in a

more useful chart form" in the ITC's determination. (*Id.* at 37-38.) Defendant-Intervenors assert

that although the ITC cited "official Commerce statistics" as the source for the data, and not the

specific staff notes, the source of the information is part of the record. (*Id.* at 38-39 (citing *Cold-

Rolled I* at 29 n.171).) Defendant-Intervenors also assert that Domestic Integrated Producers'

contention that they were not provided with an opportunity to comment on the data is without

merit. (*Id.* at 39.) Initially, Defendant-Intervenors note that Plaintiffs are only entitled to an

opportunity to comment on "information submitted 'to' the administering authority, not 'by' the

administering authority." (*Id.* at 39-40 (quoting *Tung Mung Dev. Co., Ltd. v. United States*, No.

99-07-00457, 2001 Ct. Int'l Trade LEXIS 94, at *66 (Ct. Int'l Trade 2001)).) Further,

Defendant-Intervenors contend that the parties were provided with an opportunity to comment on

the data and, in fact, addressed the data in their briefs and comments before the ITC. (*Id.* at 40-

41 (citing Prehr'g Br. of Nucor et al. Ex. 2 (P.R. at 128) (C.R. 259); J. Posthr'g Br. of Resp'ts. at

8-10 (P.R. 188) (C.R. 283)).)

Defendant-Intervenors contend that the ITC reasonably excluded Korean imports from its comparison of hot-rolled import volume trends. (*Id.* at 41.) Defendant-Intervenors note that the exclusion granted to UPI, the Korea-United States joint venture, "is a matter of public record" and was discussed throughout the administrative hearings. (*Id.* at 42-43 (citing Hr'g Tr. at 166 (P.R. 157); Annex to Presidential Proclamation 7529).) Defendant-Intervenors assert that the ITC needed to account for the exclusion and reasonably excluded all Korean imports. (*Id.* at 44.) Defendant-Intervenors also note that the import volume trends comparison was just one basis upon which the ITC found that the Section 201 proceedings were the overwhelming factor in import volume declines. (*Id.*)

Regarding Plaintiffs' contentions about the *Purchaser Questionnaire Responses*, Defendant-Intervenors contend that the ITC specifically acknowledged the responses regarding the impact of the pending AD/CVD investigations on the domestic market and properly weighed the evidence to determine that the Section 201 investigations had a more significant impact. (*Id.* at 34.) Defendant-Intervenors contend that it was reasonable for the ITC to conclude that the Section 201 proceedings were the "overwhelming factor" in the decline of subject imports because a larger percentage of purchasers responded that the Section 201 proceedings had an effect on subject import volume. (*Id.* at 35 (citing *Cold-Rolled I* at 30 n.174).) Defendant-Intervenors contend that the presence of a smaller majority of purchaser responses indicating that the AD/CVD petitions also had an effect on import volume does not make the ITC's conclusion unsupported or unreasonable. (*Id.*) Defendant-Intervenors assert that the ITC is given the discretion to weigh the evidence and the Court should not be persuaded by Plaintiffs' contentions otherwise. (*Id.* at 36.)

Contrary to Plaintiffs' contentions, Defendant-Intervenors assert that the ITC adequately addressed the volume decline of subject imports from the developing countries exempt from the Section 201 tariffs.  (*Id.* at 46.)  Defendant-Intervenors assert that the decline in volume was explained by the uncertainty of the exclusions until after the President's announcement in March 2002 and by the warnings given to the developing countries in that announcement.  (*Id.* at 47-48.)

Defendant-Intervenors contend that Nucor's arguments regarding imports from non-subject countries were fully considered and rejected by the ITC during the administrative proceedings.  (*Id.* at 45-46.)  Defendant-Intervenors assert that the ITC reasonably "place[d] little weight" on the non-subject import data in determining that the Section 201 proceedings had a more significant impact on the decline in import volume than the AD/CVD petitions.  (*Id.* at 47 (quoting *Cold-Rolled I* at 35 n.210).)

Finally, Defendant-Intervenors summarily address Plaintiffs' various contentions regarding evidence submitted to the ITC but not expressly addressed in its final determinations. (*Id*. at 69.)  Defendant-Intervenors assert that the ITC is not required by statute to address every argument or piece of evidence introduced by the parties during the administrative process.  (*Id.*) Defendant-Intervenors note that the statute only requires the ITC to address arguments that are "relevant" to the ITC's determination.  (*Id.* at 70 (quoting 19 U.S.C. § 1677f(i)(3)(B)).) Defendant-Intervenors assert that this Court has held that an agency "must address significant arguments and evidence which seriously undermine its reasoning and conclusions," but that the agency "need not address every issue presented to it."  (*Id.* (quoting *Altex*, 167 F. Supp. 2d at 1374; *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1374 (Ct. Int'l Trade 2002) (citation omitted)).)  Defendant-Intervenors contend that the

ITC has substantial discretion to "evaluate, accept, and reject evidence" in reaching its conclusions. (*Id.*) Defendant-Intervenors emphasize that it is presumed that the ITC has considered all of the relevant evidence before it. (*Id.* at 70-71 (citing *Dastech Int'l*, 963 F. Supp. at 1226; 28 U.S.C. § 2639(a)(1)).) Defendant-Intervenors state that the SAA instructs the ITC to either address all "material and relevant" factors and arguments, or "provide a discussion or explanation . . . that renders evident the agency's treatment of a factor or argument." (*Id.* (quoting SAA at 892, 1994 U.S.C.C.A.N. at 4216).) Defendant-Intervenors contend that the ITC's determination cannot be overturned "simply because Plaintiffs claim that the [ITC] did not explain it views on every argument and every piece of evidence." (*Id.* at 72.)

Defendant-Intervenors conclude that the ITC's determination that the volume of subject imports was not significant is supported by substantial evidence. (*Id*. at 48.)

ANALYSIS

**A. The ITC's Volume Finding is Supported by Substantial Evidence.**

This Court holds that the ITC's finding that the volume of subject imports was not significant is supported by substantial evidence. Under § 1677(7)(I), the ITC examined the effect that the pendency of the AD/CVD investigation had on post-petition data and determined not to reduce the weight accorded to the post-petition data. *Cold-Rolled I* at 31; 19 U.S.C. § 1677(7)(I). Accordingly, after examining data from the entire POI, the ITC found that "the present volume of subject imports is not significant." *Cold-Rolled I* at 33.

First, the Court finds that the ITC reasonably exercised its discretion in deciding not to discount the post-petition data based on its finding that the Section 201 proceedings were the "overwhelming" factor in the decline of subject imports in 2002. Second, the Court holds that,

based upon the record, including the post-petition data, the ITC's determination that the volume

of subject imports was not significant is supported by substantial evidence.

1.  **The ITC's Finding that the Section 201 Proceedings were the Overwhelming Factor in the Decline of Subject Imports in the Most Recent Period Examined is Supported by Substantial Evidence; thus, the ITC Reasonably Exercised its Discretion in Deciding not to Discount the Post-petition Data.**

The statute that guides the ITC's consideration of post-petition data is written

permissively. *See* 19 U.S.C. § 1677(7)(I). Although the ITC is required ("shall consider") to

examine the pending AD/CVD investigation's effect of volume, price, and impact data, if the

ITC finds that the AD/CVD investigation had an effect on the post-petition data, the ITC then has

the discretion ("may") to "reduce the weight accorded" to that data. *Id*; *see also*, *Comm. for Fair*

*Beam Imps.*, 2003 Ct. Int'l Trade LEXIS 79, at *47 (stating that § 1677(7)(I) directs that "the ITC

'may' discount [post-petition] data, with the implication that, where proper, it need not"); *Altx*,

167 F. Supp. 2d at 1361 (holding that "the ITC . . . is not required to discount the [post-petition]

data[,] even if the agency finds a change in data to be related to the pendency of the

investigation."); SAA at 854, 19 U.S.C.C.A.N. at 4186 (stating that the ITC may reduce the

weight accorded to post-petition data "[i]n the absence of sufficient evidence . . . establishing that

such change is related to factors other than the pendency of the investigation.").

In this case, the ITC considered if any change in data was related to the pending AD/CVD

investigations. *See Cold-Rolled I* at 28, 30 n.175, 31 & n.186, 34 n.209. The ITC found that

"both the pending investigations and the Section 201 investigation had an impact on subject

import volumes." *Id*. at 30 n.175. However, the ITC concluded that the Section 201 proceedings

were "the most significant factor in the decline of subject imports during the most recent period

examined." *Id*. The ITC expressly rejected the petitioners' arguments to accord less weight to the post-petition data because it found that there was substantial evidence indicating that the change in post-petition data was attributable to the Section 201 proceedings. *Id.* at 31.

For the reasons discussed below, the Court holds that the ITC's finding that the Section 201 proceedings were the overwhelming factor in the decline in subject import volume is supported by substantial evidence; thus, the ITC reasonably exercised its discretion in not discounting the post-petition data.

**a. The ITC's Correlation Between Key Events in the Section 201 Proceedings and the Decline in the Volume of Subject Imports was Reasonable.**

This Court holds that the ITC's correlation of key events with the decline in subject import volume is supported by substantial evidence. As required, the ITC articulated a "rational connection between the facts found and the choice made." *Bando Chemical Indus. v. United States*, 787 F. Supp. 224, 227 (Ct. Int'l Trade 1992) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (in turn quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). To support its conclusion that the Section 201 proceedings were the overwhelming factor in the decline of subject imports, the ITC examined the steadily declining volume data following key events in the Section 201 proceedings. *Cold-Rolled I* at 28. Taking into account the 102-day lead time, the ITC found the following correlations: following ITC's remedy recommendation issued in December 2001, subject imports declined to 73,522 tons in March 2002, compared to 161,542 in March 2001 and 156,394 in February 2002; following the President's announcement of the Section 201 tariffs, subject imports declined to 8,409 tons in June 2002, compared to 185,523 tons in June 2001. *Id.*

Additionally, the ITC noted that throughout the first half of 2002 subject import volumes declined dramatically. *Id.* The ITC highlighted the fact that the provisional antidumping duties in these AD/CVD investigations were not even announced until May 2002, when subject imports had already dropped to minimal levels in the domestic market. *Id.*

First, the Court finds that Plaintiffs' claim that the decline in volume from December 2001 to January 2002 undermines the ITC's correlation is without merit. The ITC expressly "recogniz[ed] that another sharp decline in subject import volume occurred between December 2001 (when subject import volume were the highest of any month of the entire period examined) and January 2002." *Id.* at 30 n.175. The ITC stressed that this decline "follow[ed] both the filing of the [AD/CVD] petitions and the [ITC's] affirmative injury vote in the Section 201 investigation on October 22, 2001." *Id.* Thus, the ITC attributed the December-January decline to a combination of factors: the pending AD/CVD investigations <u>and</u> the Section 201 investigations. *Id.* Based upon the subsequent volume declines following the ITC's remedy recommendations in December 2001 and the tariff announcement in March 2002, the Court finds that the ITC reasonably correlated the decline in the volume of subject imports with events in the Section 201 proceedings. Even though the evidence indicates that both the AD/CVD petitions and the Section 201 investigations had an effect on data from 2002, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted); *see also*, *Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although [plaintiff] points to evidence supporting the dissenting commissioner's decision . . . this does not mean that the [ITC's] affirmative determination is

unsupported by substantial evidence. The Supreme Court has stated that under the substantial evidence standard two inconsistent conclusions could be adequately supported.").

Second, the Court is not persuaded by Nucor's arguments that importers react differently to AD/CVD investigations than they do to Section 201 investigations. Nucor's contentions are speculative and are not supported by record evidence. Although there are undisputed differences between the two remedies, as discussed in *supra* Part I.ANALYSIS.A.2., p. 31, the Court has maintained that the ITC "may consider the broader conditions of competition affecting the domestic industry in evaluating the significance of the volume of subject imports." *Taiwan Semiconductor Indus. Ass'n*, 118 F. Supp. 2d at 1258 (citing *Angus Chem. Co.*, 944 F. Supp. at 952-953 ("The [ITC] evaluates import volume 'in light of the conditions of trade, competition, and development regarding the industry concerned.'") (citations omitted)).

**b. The ITC's Volume Trends Comparison Between Hot-Rolled, Coated, and Cold-Rolled Steel Imports Was Reasonable.**

This Court holds that the ITC's volume trends comparison for other flat-rolled steel products was reasonable. As additional support for its conclusion that the Section 201 proceedings were the overwhelming factor in the decline of subject import volume, the ITC compared volume trends for other flat-rolled steel products which were not subject to pending AD/CVD investigations, but which were subject to the Section 201 proceedings. *Cold-Rolled I* at 29. The ITC found that imports of hot-rolled steel and coated steel exhibited similar volume decline after the Section 201 proceedings were initiated. *Id.* The ITC compared the import volume from January to March 2002 with the import volume from April to June 2002. *Id.* The ITC found that imports of subject cold-rolled steel declined by 85.7%; imports of hot-rolled steel

declined by 58.0%; and imports of coated steel declined by 74.6%.  *Id.*

First, the Court finds that the ITC's volume trends comparison was based on information in the record.  Under 19 U.S.C. § 1516a(b)(2)(A), the record "shall consist of . . . a copy of all information presented to or <u>obtained by</u> . . . the [ITC] during the course of the administrative proceeding, including all governmental memoranda pertaining to the case . . . , a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register."  19 U.S.C. § 1516a(b)(2)(A)(i)-(ii) (emphasis added).  Further, the record consists of "information which was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'"  *Beker Indus.*, 7 Ct. Int'l Trade at 315 (quoting S. REP. NO. 96-249, at 247-248 (1979)).  Here, the ITC stated that the volume trends comparison was based on information "[c]ompiled from official Commerce statistics."  *Cold-Rolled I* at 29 n.171.  Although the ITC correctly cited the information as "compiled from official Commerce statistics," it would have been more accurate for the ITC to cite to documents created by ITC staff contained in the administrative record.  Specifically, the hot-rolled and coated steel import data were taken from a table created by an ITC staff member: Worksheets Karen Taylor – Hot-Rolled and Corrosion Resistant Imports (C.R. 813) (C.R. 868).  As Defendant contends, the same import data contained in the staff document are publically available through the ITC's Trade Dataweb online service.  *See* http://dataweb.usitc.gov/.  Although the ITC might have inaccurately cited the information, the import data for hot-rolled and coated steel is clearly evidence on the record.

The Court finds that Plaintiffs' contention that the ITC was required to provide them with an opportunity to comment on this import data under § 1677m(g) is without merit.  Section

1677m(g)'s "statutory opportunity for comment applies only to information submitted 'to' the administering authority, not 'by' the administering authority." *Tung Mung Dev. Co.*, 2001 Ct. Int'l Trade LEXIS 94, at *66; 19 U.S.C. § 1677m(g). Here, the hot-rolled and coated steel import information was compiled by ITC staff members from publically available Commerce statistics. The ITC's failure to provide a specific opportunity for petitioners to comment on this data is not contrary to the mandate of § 1677m(g).

Next, the Court holds that the ITC reasonably excluded all Korean imports in its volume trends comparison of hot-rolled imports. In *Cold-Rolled I*, the ITC explained that the cold-rolled data included data from all countries subject to these AD/CVD investigations, and that the hot-rolled and coated steel data included data only from those countries covered by the Section 201 tariffs, except that hot-rolled import data from Korea was excluded "pursuant to an exclusion request granted to POSCO." *Cold-Rolled I* at 29 n.171. As Defendant and Defendant-Intervenors note, this exclusion was discussed by the parties during the administrative proceedings and referenced in the President's Proclamation that was part of the administrative record before the ITC. *See* Annex to Presidential Proclamation 7529, ¶ 11(b)(xxiv); Hr'g Tr. at 166 (P.R. 157); Posthr'g Br. of the Korean Iron and Steel Association, POSCO, Hysco Steel Co., and Dongbu Steel Co., Ltd. at 2 n.2 (P.R. 190) (C.R. 288). Based on the exclusion granted under the Presidential Proclamation, the Court holds that the ITC reasonably excluded all hot-rolled data from Korea in its comparison of import volume trends to avoid skewing the data from other countries where certain producer's imports were not granted specific exclusions. As Defendant notes, the goal of the ITC's comparison was to "observe trends in hot-rolled steel imports" after the Section 201 tariffs were imposed. (Def.'s Br. at 62.) The ITC reasonably excluded all

Korean hot-rolled data in achieving this goal.

Lastly, the Court finds that the ITC's choice to compare all subject cold-rolled steel imports, including imports from those countries that were exempt from the Section 201 tariffs, with only those hot-rolled and coated imports subject to Section 201 tariffs was reasonable. It is clear from the ITC's analysis that the ITC wanted "to compare the impact of the petitions and the impact of the Section 201 remedy." (*See* Def.'s Br. at 64.) The Court finds that it was reasonable for the ITC to compare all subject cold-rolled steel imports – imports that would have been affected by the AD/CVD petitions – with hot-rolled and coated steel imports that were subject to the Section 201 tariffs – imports that would have been affected by the Section 201 remedy. Further, as discussed in the price effects section below, the ITC's comparison of spot prices for the three flat-rolled products provided additional support for the ITC's conclusion that the Section 201 proceedings were the overwhelming factor in the decline of subject imports.

**c. The ITC's Use of the *Purchasers' Questionnaire Responses* Indicating that the Section 201 Relief had an Effect on Subject Import Volume was Reasonable.**

Based on the record evidence, this Court holds that it was reasonable for the ITC to use the domestic purchasers' questionnaire responses to support its finding that the Section 201 investigations and resulting remedy were the overwhelming factor in the decline of subject imports. In *Cold-Rolled I*, the ITC acknowledged purchasers' responses regarding both the pending AD/CVD investigations and the Section 201 proceedings. *Cold-Rolled I* at 30 n.174. In challenging the ITC's reliance on these questionnaire responses, Plaintiffs are essentially asking this Court to shift the weight that the ITC accorded to the domestic producers' responses regarding the Section 201 proceedings versus the AD/CVD petitions. "It is not the Court's

function to reweigh the evidence, but to decide whether the [ITC's] determinations are supported

by substantial evidence." *Granges Mettallverken AB v. United States*, 716 F. Supp. 17, 21 (Ct.

Int'l Trade 1989) (citations omitted).  Plaintiffs' contentions do not detract from the

reasonableness of the ITC's use of the *Purchasers' Questionnaire Responses* indicating that the

Section 201 proceedings reduced import volume.

### d.  The ITC Adequately Addressed the Evidence Regarding Import Volumes from the Developing Countries Exempt from the Section 201 Tariffs.

Contrary to Plaintiffs' contentions, the Court finds that the ITC adequately addressed the

fact that cold-rolled imports from the developing countries exempt from the Section 201 tariffs

continued to decline during the POI.  *See Cold-Rolled I* at 35 n.210.  The ITC explained this

decline by reasoning that importers and exporters did not know that subject imports from these

countries would be exempt from the Section 201 tariffs until after the President's announcement

in March 2002.  *Id.*  Further, the ITC provided five additional reasons why subject imports from

these developing countries were insignificant and were likely to remain insignificant: "their

current and historically very low [import] levels, the Section 201 monitoring measures applied to

these countries, the availability of other markets to the subject producers, the relatively low share

of production exported to the United States by these countries during the period examined, and

the availability of additional capacity in the United States to supply demand." *Id.* at 44.  This

Court finds that the fact that imports from these countries continued to decline through the POI

does not detract from the reasonableness of the ITC's conclusion that the Section 201

proceedings had an overwhelming effect on the subject import volumes based on the ITC's

articulated rationale regarding the timing of the announced exemptions and the additional

explanations provided by the ITC.

**e.  The ITC Reasonably Rejected the Econometric Analysis Provided by Nucor during the Administrative Proceedings.**

This Court holds that the ITC adequately examined the econometric analysis submitted by Nucor during the administrative proceedings and articulated a satisfactory explanation for placing little weight on the analysis.  As the Court indicated earlier, "[i]t is up to the ITC to weigh evidence."  *Altx*, 167 F. Supp. 2d at 1361 n.9 (citing *Mukand Ltd. v. United States*, 937 F. Supp. 910, 914-915 (Ct. Int'l Trade 1996)).  The ITC has the "discretion to make reasonable judgments and inferences in interpreting evidence and determining the overall significance of any particular fact or piece of evidence."  *Chung Ling Co. v. United States*, 805 F. Supp. 56, 61 (Ct. Int'l Trade 1992).  In explicitly rejecting Nucor's analysis during the administrative proceedings, the ITC stated that it "d[id] not find persuasive Petitioner's [econometric] analysis that purported to isolate the effects on the cold-rolled market of the current [AD/CVD] investigation and the Section 201 relief."  *Cold-Rolled I* at 31.  The ITC considered the econometric analysis further in its discussion of price effects observing that although the "[econometric] analysis includes data through April 2002, it does not specifically measure the effect of the pendency of these investigations and the Section 201 remedy."  *Id.* at 34-35 n.209.  The ITC also rejected the comparison of subject imports with imports from non-subject countries stating that "we place little weight on the comparison of subject and nonsubject import volumes for countries covered by the [Section 201] safeguard action, in light of the very small volume of nonsubject imports."  *Id.* at 35 n.210.  Nucor provides no support for its contention that 4.5% of open market consumption by volume, and 4.8% by value "could not reasonably be described as 'very small.'"

(*See* Nucor's Br. at 22 (citing *Cold-Rolled I* at 35 n.210; Final Staff Report App. J at J-7).)

Further, the ITC examined the submitted econometric analysis in so far as it compared subject

import volumes with imports from countries that were not subject to these AD/CVD

investigations and were exempt from the Section 201 tariffs. *Id*. at 35 n.210.  In examining that

part of the submitted analysis, the ITC stated that it did not find the analysis convincing "given

the substantial volume of nonsubject imports accounted for by NAFTA partners." *Id*.  The ITC

concluded that it did "not find this [econometric] analysis probative in assessing present material

injury given the overwhelming impact of the Section 201 remedy on U.S. market conditions and

the sharp decline in subject imports during 2002." *Id.* at 34-35 n.209.  The Court finds that based

upon these articulated reasons, the ITC reasonably dismissed Nucor's econometric analysis.

**f.  The Court Finds that Plaintiffs' Other Arguments Regarding Volume are Without Merit.**

The Court holds that Plaintiffs' other arguments regarding volume are without merit.

First, the Court finds that the ITC Nucor's alternative contention that the subject imports

occupied a significant percentage of market share by volume is without merit.  Nucor's argument

rests on a comparison of the findings in these determinations with the findings in prior ITC

determinations.  (*See* Nucor's Br. at 27-28.)  "[I]t is [a] well-established proposition that the

ITC's material injury determinations are *sui generis*; that is, the agency's findings and

determinations are necessarily confined to a specific period of investigation with its attendant,

peculiar set of circumstances." *Comm. for Fair Beam Imps.*, 2003 Ct. Int'l Trade LEXIS 79, at

*32 (citing *U.S. Steel Group v. United States*, 873 F. Supp. 673, 695 (Ct. Int'l Trade 1994)).  As

Defendant notes, courts have recognized that each investigation "'involv[es] a unique

combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded . . . as dispositive of the determination in a later investigation.'" *Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1379 (Ct. Int'l Trade 1999) (quoting *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1087-1088 (Ct. Int'l Trade 1988) (in turn quoting *Armstrong Bros. Tool Co. v. United States*, 489 F. Supp. 269, 279 (Cust. Ct. 1980)). This Court finds that Nucor does not present any evidence that suggests that the ITC has deviated from an agency practice in its volume analysis; thus, the ITC is not required to explain the discrepancies between its findings in *Cold-Rolled I* and its findings in other determinations. *See Comm. for Fair Beam Imps.*, 2003 Ct. Int'l Trade LEXIS 79, at *31-*32.

Second, the Court presumes that the ITC considered all of the evidence on the record and finds that the ITC was not required to address certain evidence submitted by Domestic Integrated Producers: specifically, a certain report regarding imports, a quote from one foreign producer, and a news articles that quoted Russian steel producers. (*See* Domestic Integrated Producers' Br. at 50-51 (citing Domestic Integrated Producers' Posthr'g Br. Exs. 12, 13, 54 (P.R. 193) (C.R. 294)).) According to Domestic Integrated Producers, this evidence demonstrated Section 201's limited effect on the importation of subject imports. (*See* Domestic Integrated Producers' Br. at 51.) Under 19 U.S.C. § 1677f(i)(3)(B), "the [ITC] shall include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties." 19 U.S.C. § 1677f(i)(3)(B). However, "the fact that certain information is not discussed in [an ITC] determination does not establish that the [ITC] failed to consider that information because there is no statutory requirement that the [ITC] respond to each piece of

evidence presented by the parties." *Granges Metallverken*, 716 F. Supp. at 24 (citations omitted). Further, "[t]he ITC is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record." *USEC Inc. v. United States*, 2002 U.S. App. LEXIS 7845, *13-*14 (Fed. Cir. 2002). The Court finds that the evidence presented by Domestic Integrated Producers does not raise additional "relevant argument" that the ITC is statutorily required to address under § 1677f(i)(3)(B). The evidence, if anything, merely indicates that the Section 201 tariffs did not preclude all imports of cold-rolled steel, a conclusion upon which the ITC did not rely in making its final determination. The Court finds that the evidence is merely further argument that the pending AD/CVD investigations were a more significant factor than the Section 201 relief in the decline of subject imports. Thus, as discussed above, the ITC addressed the argument that the pending AD/CVD petitions affected subject import volume, *see Cold-Rolled I* at 29-30 nn.173-175 & 34-35 nn.209-210, and presumably considered the evidence submitted by Domestic Integrated Producers during the administrative proceedings.

Taken as a whole, the ITC's correlation between key events in the Section 201 proceedings and dramatic declines in subject import volume; its comparison of imports trends for other flat-rolled steel products; and the *Purchasers' Questionnaire Responses* indicating Section 201's impact on subject import volume, provide substantial evidence to support the ITC's finding that the Section 201 proceedings were the overwhelming factor in the decline of subject import volume. The Court finds that the ITC reasonably exercised its discretion not to discount the post-petition data based on substantial evidence in the record that indicated that the Section 201 proceedings were the overwhelming factor in the decline in volume in 2002, not the pending

AD/CVD investigations.

## 2. The ITC's finding that the volume of subject imports was not significant is supported by substantial evidence.

As discussed above, the ITC has the discretion to focus on the data nearest to vote day. *See supra* Part I.ANALYSIS.A, pp. 26-27; *see also*, Seafoods *II*, 19 Ct. Int'l Trade at 44 n.22 ("[O]lder information serves to provide a historical frame of reference against which a 'present' . . . material injury determination is to be made, and without which any assessment of the extent of changed circumstances would be impossible."). Thus, based upon substantial evidence in the record demonstrating the dramatic decline in import volumes during 2002, *see Cold-Rolled I* at 32-33, this Court holds that the ITC reasonably determined that the volume of subject imports was not significant.

## III. The Effect of Subject Imports on Domestic Prices.

### ITC's DETERMINATION

As an initial matter, the ITC noted that 55% of domestic sales and 52% of imported sales are made by contracts. *Cold-Rolled I* at 26. The ITC stated that even though most contracts have fixed prices and quantities, spot prices may influence contract prices. *Id.* Specifically, the ITC noted that although "contract prices are generally 'locked in' and therefore lag behind spot prices for a period, the record also indicates that spot prices do have some impact on contract prices. Spot prices impact contract prices in the cold-rolled market when new contracts are negotiated, expired contracts are renegotiated, or an executory contract contains a meet-or-release provision." *Id.* The ITC also remarked that there was "some evidence on this record of sellers

demanding price increases or buyers demanding price concessions under executory contracts when spot prices differ significantly from contract prices." *Id.* Additionally, the ITC noted that "during the first half of 2002, the spot market prices for cold-rolled steel increased more rapidly (10.7 percent) than U.S. producers' open market average selling prices, which were essentially unchanged (-0.5 percent) and that over half of domestic producers' cold-rolled sales were under contract." *Id.* at 27 n.158 (citations omitted). The ITC acknowledged the petitioners' argument that "the majority of contracts remained in place in 2002 at low prices that were negotiated in the fourth quarter of 2001." *Id*. at 26-27 (citing Posthr'g Br. of Nucor et al. at 25-28 (P.R. 192) (C.R.291)).

In its underselling analysis, the ITC gathered quarterly price comparisons from domestic producers on two products sold in the United States. *Id.* at 34. Of the 455 possible comparisons, domestic producers reported that subject imports undersold domestic products in 296 quarters and oversold domestic products in 159 quarters. *Id.* Although the ITC noted more instances of underselling than overselling, the ITC found that the data showed that "most of the underselling occurred earlier in the period examined, prior to the imposition of Section 201 relief." *Id.* The ITC also noted that the underselling margins were greater in 1999 than they were in 2002. *Id*. at 34 n.207. The ITC compared the underselling margins in 1999 to those in 2002 and found that "the average margin of underselling was 9.1 percent in 1999 compared with overselling of 4.0 percent in 2002; average underselling for sales to end users was 24.8 percent in 1999 compared with 1.5 percent in 2002." *Id*.

The ITC noted that domestic prices declined through 2001, as subject imports' market share in the United States increased. *Id.* at 34. However, the ITC found recovering domestic

prices in 2002 after the imposition of the Section 201 relief. *Id.* at 34-35. The ITC found that

spot prices increased from $340 per ton in June 2001 to $435 per ton in June 2002. *Id*. at 35.

Further, the ITC compared the prices for the two specific products and noted that prices for the

first product rose by 7.2% in sales to service centers, and by 2.7% in sales to end users from the

end of 2001 to the second quarter of 2002. *Id*. at 35 n.212. Domestic prices for the second

product rose by 15.1% in sales to service centers and by 9.8% in sales to end users over the same

time. *Id*. The ITC found that prices in the first half of 2002 had not risen to the highest levels of

the POI, but attributed this to the fact that "many contracts continue to be honored at the price

levels negotiated at the end of 2001 when prevailing market prices were significantly lower." *Id*.

The ITC found that over half of domestic purchasers reported supply problems since

March 2002. *Id*. The ITC noted that 80 out of 91 purchasers responded that they had received

notices of price increases since March 2002. *Id*. The ITC found that the closure of one domestic

production facility in December 2001 "temporarily contributed" to the rising domestic prices,

along with the "withdrawal of subject imports from the market following the Section 201

action." *Id*. The ITC noted that in May 2002, production at that facility resumed, while domestic

prices continued to increase and subject imports continued to withdraw from the market. *Id*. at

36. The ITC mentioned that no lost sales or lost revenue allegations were made by the domestic

producers in the preliminary phases of the investigation, and only one of the lost revenue

allegations made in the final phase of the investigations was confirmed. *Id*.

The ITC found that although subject imports that entered earlier in the POI "continue to

have an effect on the industry's contract prices negotiated before the Section 201 relief was

effective, subject imports currently entering the market are not suppressing current domestic

prices to a significant degree." *Id.* Based on the "current volume of subject imports and the increase in domestic prices in 2002," the ITC concluded that the "subject imports are not adversely affecting domestic prices to a significant degree." *Id.*

## PARTIES' CONTENTIONS

### A. Nucor's Contentions.

Nucor contends that the evidence in the record demonstrates that the subject imports had an adverse effect on domestic prices. (Nucor's Br. at 29.) First, Nucor contends that the ITC failed to make the required statutory findings regarding underselling and that substantial evidence in the record shows that underselling was significant. (*Id.*) Second, Nucor asserts that the ITC ignored evidence that the subject imports continued to suppress and depress domestic prices throughout the POI and incorrectly attributed the improvements in domestic spot prices to the imposition of the Section 201 relief. (*Id.*)

First, regarding underselling, Nucor contends that the ITC failed to make the specific findings required under § 1677 in its price effects analysis. (*Id.*) Nucor asserts that the statute requires the ITC to make two distinct findings: (1) whether there has been significant underselling; and (2) whether the subject imports otherwise significantly depress or suppress domestic prices. (*Id.* at 30 (citing *Altx*, 167 F. Supp. 2d at 1366).) Nucor contends that the ITC did not make the first required finding: whether significant underselling had occurred. (*Id.*) Rather, Nucor contends that the ITC based its price effects conclusion solely on a finding that the subject imports were not otherwise suppressing or depressing domestic prices. (*Id.*) Had the ITC made the required finding, Nucor contends that the ITC should have found that underselling was significant throughout the POI based on the record evidence and its past determinations. (*Id.* at

31.) Nucor reiterates the ITC's finding that underselling occurred in 296 out of the 455 possible

quarterly price comparisons. (*Id.* (citing *Cold-Rolled I* at 34).) Nucor argues that in prior

determinations involving hot-rolled steel and steel plate, the ITC found significant underselling

when it occurred even less frequently than in this case. (*Id.* (citing *Certain Cut-to-Length Steel

Plate from France, India, Indonesia, Italy, Japan, and Korea*, Invs. Nos. 701-TA-387-391, 731-

TA-816-821 (Final) USITC Pub. 3273 at 24 (Jan. 2000); *Hot Rolled Steel Products from

Argentina and South Africa*, Invs. Nos. 701-TA-404, 731-TA-898, 905 (Final) USITC Pub. 3446

at 21 (Aug. 2001)).) Further, Nucor asserts that the percentage of undersold imports peaked in

quarters with the highest import volumes, and that the ITC has "consistently considered this a

significant indicator" of adverse effects on domestic prices. (*Id.* (citing *Certain Welded Large

Diameter Line Pipe from Japan*, Inv. No. 731-TA-919 (Final) USITC Pub. 3464 at 18 (Nov.

2001)).) Nucor also contends that the fact that underselling occurred in every quarter of the POI

and that such high volumes of imports were involved in underselling, should have played into the

ITC consideration of whether underselling was significant. (*Id.*) Nucor asserts that the "volume

of imports involved in underselling is especially noteworthy." (*Id.*) Nucor contends that

contrary to the ITC's finding that most of the underselling occurred earlier in the POI, the data

reveal that underselling occurred in 22 of the 39 pricing quarters in 2002 – or in 56.4% of the

comparisons. (*Id.* at 31-32 (citing Final Staff Report at V-8 – V-12).) Nucor contends that the

overall margin of underselling was substantial, and that the ITC has previously held this same

margin level to be significant. (*Id.* at 32 (citing *Acciai Speciali Terni S.p.A. v. United States*, 19

Ct. Int'l Trade 1051, 1060 (Ct. Int'l Trade 1995)).)

       Second, Nucor contends that the subject imports continued to suppress and depress

domestic prices throughout the POI. (*Id.* at 33.) Nucor asserts that the ITC's determination to the contrary is not supported by substantial evidence in the record. (*Id*.) Nucor contends that the ITC overstated the recovery of domestic prices in 2002, noting that in the second quarter of 2002, domestic prices were still lower than at the beginning of the POI. (*Id*. at 34.) Nucor contends that any recovery in the domestic market is the result of the domestic steel industry's deliberate choice to lower prices in order to remain competitive with the undersold imports. (*Id.* at 32, 34-35.) Nucor contends that the fact that domestic spot prices increased at the very end of the POI "do[es] not negate the possibility that . . . underselling caused price suppression or depression." (*Id*. at 35.) Additionally, Nucor contends that the ITC failed to adequately examine the effect that the AD/CVD investigations had on domestic prices and incorrectly attributed the rise in domestic prices in 2002 to the Section 201 proceedings. (*Id*. at 36-37.) As it argued regarding volume, Nucor contends that it supplied the ITC with a "comprehensive econometric analysis showing that 80 percent of the increase in domestic cold-rolled prices in 2002 was attributable to the institution of the [AD/CVD] investigations" which the ITC unreasonably ignored in its price effects analysis. (*Id*. at 37.) Finally, Nucor contends that the ITC "conceded the latent impact" that earlier imports had on domestic contract prices, "but then disregarded its own evidence." (*Id*. at 39.) Nucor contends that "domestic prices at the end of the period of review . . . were lower than they would otherwise have been" "because of underselling earlier in the POI." (*Id*.) Nucor contends that the record evidence supports a finding that the subject imports suppressed and depressed domestic prices throughout the POI. (*Id*. at 39-40.)

## B. Domestic Integrated Producers' Contentions.

Domestic Integrated Producers contend that the ITC's findings that the subject imports

were not adversely affecting prices of the domestic like product is not supported by substantial evidence. (Domestic Integrated Producers' Br. at 52.) According to Domestic Integrated Producers, record evidence contradicts the ITC's finding and demonstrates that the subject imports were adversely affecting domestic prices. (*Id*.) Specifically, Domestic Integrated Producers contend that: (1) underselling was significant throughout the POI; (2) subject imports continued to have an adverse effect on domestic contract prices, even after the imposition of the Section 201 relief; (3) spot price recovery in the domestic market did not coincide with the Section 201 relief. (*Id.* at 52, 54.)

First, Domestic Integrated Producers assert that the ITC's conclusion that underselling during the POI was not significant is unsupported by substantial evidence. (*Id.* at 52.) Domestic Integrated Producers note that the ITC's quarterly pricing comparisons indicated underselling in 296 out of 455 instances. (*Id.* at 53 (citing *Cold-Rolled I* at 34).) Domestic Integrated Producers assert that underselling "continued unabated" throughout the POI. (*Id*. at 55.) Domestic Integrated Producers argue that the ITC should have considered the underselling data assessed by volume because, when assessed by volume, the significance of the underselling is more apparent. (*Id.* at 53.) Domestic Integrated Producers contend that when assessed by volume, the evidence shows that "77.7[%] of the volume of subject imports represented by the[] 2 products undersold the domestic like products over the POI." (*Id*.) Domestic Integrated Producers contend that the ITC unreasonably relied on data representing the "simple average margin of underselling." (*Id.* at 56.) According to Domestic Integrated Producers, using the simple average margin "may greatly understate the extent of underselling where the volumes involved in the comparisons vary significantly." (*Id.* at 57.) Domestic Integrated Producers contend that this is the case here

because, when measured by volume, the amount of underselling was significant throughout the POI and was more significant in the first half 2002 "than in any other comparable period save calendar year 1999." (*Id.* at 57-58.) Domestic Integrated Producers contend that the ITC failed to address Domestic Integrated Producers' argument that underselling was significant when assessed by volume during the administrative process. (*Id.* at 58.) Domestic Integrated Producers assert that the ITC's failure to address the data in terms of volume is contrary to the ITC's obligations under § 1677f(i)(3)(B) "to consider and address all relevant arguments made by the parties to the investigation." (*Id.*)

Further, Domestic Integrated Producers contend that the ITC unreasonably compared margins of underselling in 2002 with those in 1999 and provided no explanation why it did not compare underselling in 2002 with underselling in 2001 or 2000. (*Id.* at 59.) Domestic Integrated Producers assert that underselling, in fact, occurred in the first half of 2002 at approximately the same rate as in 2001 and at a greater rate than in 2000 or 1999. (*Id.* at 59-60 (citing Final Staff Report at V-9, Tables V-3, V-12, & V-4, *Cold-Rolled I* at 76-77 (dissent of Comm'nr Bragg)).) Domestic Integrated Producers acknowledge that the ITC "may permissibly focus its analysis on a specific time frame within the POI," but argue that the ITC cannot ignore the relevant underselling data for the rest of the POI. (*Id.* at 60.)

Additionally, Domestic Integrated Producers contend that the ITC did not address evidence submitted by the domestic industry explaining why underselling decreased from 1999 to the first half of 2002. (*Id.*) Domestic Integrated Producers contend that at the hearing and in its submissions, the domestic industry presented compelling evidence that showed that underselling decreased later in the POI because the domestic producers showed price leadership

in "act[ing] aggressively to meet import prices to prevent the loss of volume." (*Id.* at 61.)

Domestic Integrated Producers assert that the ITC's failure to address this argument and the

supporting evidence is reversible error under § 1677f(i)(3)(B). (*Id.* at 62 (citing *Altx*, 167 F.

Supp. 2d at 1359).)

Second, Domestic Integrated Producers assert that subject imports continued to have

adverse effects on contract prices in 2002. (*Id.*) Domestic Integrated Producers contend that the

ITC acknowledged the fact that a majority of sales were made under contracts with locked-in

lower prices, but then disregarded this evidence by focusing only on current imports. (*Id.*)

Third, Domestic Integrated Producers challenge the ITC's finding that the recovery of

domestic spot prices was a result of the Section 201 relief. (*Id.* at 64.) They contend that the ITC

incorrectly attributed the increase in spot prices in the second quarter of 2002 to the imposition of

Section 201 remedies. (*Id.* at 65.) To support their contention, Domestic Integrated Producers

assert that spot prices began to increase in January 2002, before any effects of the Section 201

relief would have been felt in the market. (*Id.*) Domestic Integrated Producers contend that the

ITC failed to address the spot price increase in January 2002, and focused only on the second

quarter of 2002, so that the data would support the ITC's Section 201 claims. (*Id.* at 65-66.)

Domestic Integrated Producers contend that the ITC's spot price comparisons for cold-rolled,

hot-rolled, and coated steel do not support the ITC's conclusion that the spot prices increased in

response to the Section 201 relief because similarities between these prices were exhibited "long

before the Section 201 tariffs were imposed," and "almost all parties have acknowledged [that]

prices of these three products tend to move together." (*Id.* at 67-68.) Finally, Domestic

Integrated Producers contend that the ITC also failed to address a monthly spot price report

submitted during the administrative process that detailed spot prices during the entire POI.  (*Id*. at 66.)

Domestic Integrated Producers conclude that the ITC's determination is contradicted by record evidence that demonstrates that domestic prices were significantly adversely affected during the entire POI including the first half of 2002.  (*Id.* at 69.)

## C.  Defendant's Contentions.

Defendant contends that the ITC's finding that subject imports did not have a significant adverse effect on domestic prices is supported by substantial evidence.  (Def.'s Br. at 69.)  First, regarding underselling, Defendant contends that the ITC observed that most of the underselling occurred earlier in the POI, and that after the imposition of the Section 201 tariffs, "there was no underselling at all."  (*Id.* at 69-70 (citing *Cold-Rolled I* at 46 n.207, Final Staff Report at Tables V-3, V-4 & V-6).)  Defendant also contends that the ITC properly found that in the first half of 2002, underselling had significantly declined: specifically, "on sales to service centers, the average margin of underselling was 9.1 percent per ton in 1999 compared with *overselling* of 4.0 percent in 2002; average underselling for sales to end users was 24.8 percent in 1999 compared with 1.5 percent in 2002."  (*Id.* at 70 (citing *Cold-Rolled I* at 46 n.207).)

Defendant contends that Nucor's assertion that the ITC failed to make a finding that underselling was not significant is without merit.  (*Id*.)  Defendant contends that the "path of the [ITC] may reasonably be discerned" from the ITC's discussion of the 2002 data, the reduction of underselling margins, and the absence of underselling in the second quarter of 2002.  (*Id.* at 70 (quoting *Ceramica Regiomontana*, 810 F.2d at 1139).)

Defendant rebuts Domestic Integrated Producers' contentions that the ITC should have

given more weight to the evidence of underselling assessed by volume by stating that "it is the [ITC's] role, not the parties', to determine the weight to be accorded record evidence." (*Id.* at 71.) Specifically, Defendant asserts that the ITC is not obligated to discuss the evidence submitted by Domestic Integrated Producers during the investigation regarding measuring underselling on a volume basis. (*Id.*) Rather, the ITC must only "discuss issues material to its determination so that the path of the agency may reasonably be discerned." (*Id.* (citations omitted).) Defendant contends that the Domestic Integrated Producers are, in effect, claiming that the underselling data <u>must</u> be considered on a volume basis. (*Id.* at 71-72.) Defendant contends that the ITC has "broad discretion in analyzing and assessing the significance of the evidence on price undercutting." (*Id.* at 72 (citing *U.S. Steel Group*, 873 F. Supp. at 698).) Defendant contends that this discretion includes determining which methodology to apply in the underselling analysis. (*Id.*)

Defendant acknowledges that the ITC compared underselling data for the first half of 2002 with data from 1999, but notes that the ITC considered underselling over the entire POI. (*Id.* at 73.) Defendant contends that the ITC correctly focused on the "most relevant pricing data (after the imposition of the President's 30 percent Section 201 tariffs)" to support its conclusion that the subject imports were not suppressing current domestic prices. (*Id.* at 72.) Defendant reiterates that the ITC has "substantial discretion to weigh the evidence presented," and considering the circumstances of the domestic market after the imposition of the Section 201 remedy, Defendant contends that the ITC reasonably attached significance to the most current data. (*Id.* at 73-74.)

Contrary to Plaintiffs' contentions, Defendant asserts that the ITC was not obligated

under 19 U.S.C. § 1677f(i)(3)(B) to respond to Plaintiffs' assertions that price leadership was the reason that there was no underselling at the end of the POI. (*Id.* at 74.) Defendant notes that the ITC acknowledged that a majority of purchasers identified domestic mills as the price leaders in the domestic market. (*Id.* (citing *Cold-Rolled I* at 45).) Defendant further asserts that this Court has held that the ITC does not need to evaluate the pattern of price leadership when considering underselling. (*Id.* (citing *Metallverken Nederland B.V. v. United States*, 728 F. Supp. 730, 739 (Ct. Int'l Trade 1989)).)

Defendant contends that Domestic Integrated Producers are seeking *de novo* review in asserting that the ITC did not address a monthly spot price report submitted during the administrative process. (*Id.* at 76 (citing Domestic Integrated Producers' Br. at 65).) Defendant emphasizes that the ITC "is presumed to have considered all information in the record" and is not required to reference every exhibit placed on the record by the parties. (*Id.* at 76-77.) Defendant contends that Domestic Integrated Producers improperly argue that the ITC should have accorded more weight to this particular evidence of monthly spot prices. (*Id.* at 77.) Defendant contends that this argument highlights that Plaintiffs are seeking *de novo* review of the ITC's determination instead of the proper review under the substantial evidence standard. (*Id.*) Defendant contends that even if the substantial evidence standard of review allowed the Court to re-weigh the evidence presented to the ITC, this document does not advance Plaintiffs' claims. (*Id.*) Defendant contends that although Plaintiffs seek to use this document to show the effect of the filing of the petitions on domestic prices, in fact, the information shows that a spot price in January 2002, 102-days after the petitions were filed, was the same as a spot price in September 2001, the month that the petitions were filed. (*Id.* (citing Domestic Integrated Producers Prehr'g

Br. Ex. 6 (P.R. 130) (C.R. 251)).)

Regarding the spot price increase in January 2002, Defendant asserts that the ITC attributed the spot price increase to a domestic plant closure and to the Section 201 proceedings. (*Id.* at 78 (citing *Cold-Rolled I* at 46-47).) Further, Defendant contends that by January 2002, the market would have also been affected by the Section 201 investigations that were initiated September 2001, as well as by the AD/CVD petitions. (*Id.*)

Defendant argues that the ITC recognized that many contracts in 2002 continued to be honored at lower 2001 prices, but then found that overall, subject imports were not adversely affecting domestic prices. (*Id.* at 75 (citing *Cold-Rolled I* at 46-47).) Defendant contends that the ITC "found that current imports, to which the earlier contract prices attached, were not causing material injury." (*Id.* at 88.) Defendant asserts that even though "Plaintiffs point to evidence they contend would support a different conclusion," the ITC retains the discretion to reasonably interpret and weigh the evidence on the record. (*Id.* at 75 (citing *Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 15 F. Supp. 2d 918, 925 (Ct. Int'l Trade 1998)).)

Lastly, Defendant contends that the ITC reasonably declined to base its price effects conclusions on the econometric analysis submitted by Nucor that allegedly demonstrated the effect of the AD/CVD investigations on domestic prices, over that of the Section 201 proceedings. (*Id.* at 78-79.) Defendant contends that Plaintiffs once again ignore the proper standard of review, and ask this Court to conduct *de novo* review of the record evidence and accord greater weight to the submitted analysis. (*Id.*) As argued earlier regarding volume, Defendant contends that the ITC considered the submitted econometric analysis and did not find

the analysis probative.  (*Id.*)

Defendant concludes that the ITC's finding that the subject imports did not have significant adverse price effects on the domestic market is supported by substantial evidence. (*Id.* at 81.)

**D.  Defendant-Intervenors' Contentions.**

Defendant-Intervenors contend that the ITC's finding that the subject imports were not adversely affecting the price of the domestic like product is supported by substantial evidence. (Def.-Intvs.' Br. at 48.)  First, regarding underselling, Defendant-Intervenors assert that the record demonstrates that underselling by imports was not significant during the POI.  (*Id.*) Defendant-Intervenors contend that the "mere existence of underselling" does not require a finding that the subject imports have adversely affected domestic prices.  (*Id.* at 49.)  Defendant-Intervenors contend that there must be a clear causal link between the underselling and any adverse price effects.  (*Id.* at 49-50.)  Defendant-Intervenors contend that the ITC found that by the end of the POI, domestic prices were increasing.  (*Id.* at 50 (citing *Cold-Rolled I* at 34-35).) Thus, Defendant-Intervenors assert that "underselling could not be a recognizable cause of injury because it did not cause a downward movement in prices."  (*Id.*)

Defendant-Intervenors contend that, contrary to Plaintiffs' assertions that underselling should be assessed by volume, the methodology that the ITC used to measure underselling was reasonable and in line with its established practice.  (*Id.* at 51.)  Defendant-Intervenors contend that Plaintiffs incorrectly assert that the ITC's determination is without support because the ITC failed to "exhaustively address and adopt [Plaintiffs'] methodology to calculate underselling by volume."  (*Id.* (citing Domestic Integrated Producers' Br. at 56-58; Nucor's Br. at 31-32).)

Defendant-Intervenors contend that the ITC is not obligated to measure underselling by volume and has been given broad discretion to analyze underselling data and to determine which methodology to apply.  (*Id.* at 51-52.)  Defendant-Intervenors contend that no matter which methodology is employed, underselling data from the most recent period supports the ITC's finding that subject imports were "not suppressing current domestic prices."  (*Id.* at 53 (quoting *Cold-Rolled I* at 36).)

Next, Defendant-Intervenors address Domestic Integrated Producers' contention regarding the ITC's comparison of underselling data from 2002 with data from 1999.  (*Id.*)  Defendant-Intervenors contend that, considering the overwhelming impact of the Section 201 proceedings on the domestic steel industry, the ITC appropriately compared the most recent time period, 2002, with the time period before the initiation of the Section 201 proceedings, 1999.  (*Id.*)

Further, Defendant-Intervenors contend that the ITC is not required to address Plaintiffs' "anecdotal explanations" why underselling decreased.  (*Id.* at 54.)  Regardless of Plaintiffs' assertions that underselling decreased because of the domestic industry's efforts to match import prices, Defendant-Intervenors contend that the ITC is not required to determine why prices decreased.  (*Id.* at 54-55.)

Regarding Plaintiffs' contentions about the alleged effects of earlier subject imports on domestic contract prices, Defendant-Intervenors assert that even with this evidence, the record strongly supports the ITC's determination that imports were not injurious.  (*Id.* at 55-56.)  Defendant-Intervenors note that the ITC considered the fact that many contracts would be honored at 2001 prices, but still found that subject imports were not adversely affecting domestic

prices based on the minimal level of subject imports and the increase in domestic prices at the end of the POI. (*Id.* at 56-57.)

Defendant-Intervenors contend that the ITC fully addressed Plaintiffs arguments regarding spot price increases in January 2002 in its final determination, and any contentions to the contrary "must be rejected as not true." (*Id.* at 59 (citing *Cold-Rolled I* at 34-35).) Further, Defendant-Intervenors contend that the ITC's spot price trend comparison of cold-rolled, hot-rolled, and coated steel also supports the ITC's findings that the subject imports did not adversely affect domestic prices. (*Id.* at 59-60.) Defendant-Intervenors note that the ITC acknowledged the "integrated production process" of these three steel products and found that the "relationship supports rather than distracts" from the probative value of the spot price comparisons. (*Id.* at 62 (citing *Cold-Rolled I* at 29 n.173).) Defendant-Intervenors contend that record evidence supports the ITC's finding that the dramatic increase in spot prices "for all three products was primarily caused by the Section 201 proceedings and not by the filing of the cold-rolled AD/CVD petitions." (*Id.* at 63.)

ANALYSIS

**A. The ITC's Determination that Subject Imports Were Not Adversely Affecting Domestic Prices to a Significant Degree Is Supported By Substantial Evidence.**

This Court holds that the ITC's determination that the subject import were not adversely affecting domestic prices to a significant degree is supported by substantial evidence. In evaluating the effect of subject imports on domestic cold-rolled steel prices, the ITC must consider whether there has been significant price underselling and whether the subject imports otherwise suppress or depress prices to a significant degree. 19 U.S.C. § 1677(7)(C)(ii)(I-II).

**1.  The ITC's Underselling Analysis Is Supported by Substantial Evidence.**

First, this Court does not find persuasive Nucor's contention that the ITC failed to make a statutorily required finding regarding the significance of underselling.  (*See* Nucor's Br. at 30.) Although the ITC did not expressly state that it found underselling to be insignificant, "the path of the agency may be reasonably discerned."  *Ceramica Regiomontana*, 810 F.2d at 1139 (citations omitted).  Although the ITC noted more instances of underselling than overselling, the ITC found that the data showed that "most of the underselling occurred earlier in the period examined, prior to the imposition of Section 201 relief."  *Cold-Rolled I* at 34.  Additionally, the ITC compared underselling data to determine that underselling margins were greater in 1999 than they were in 2002.  *Id*. at 34 n.207.  Based on the ITC's discussion of the decline in underselling in 2002 after the Section 201 tariffs were announced and its comparison of underselling margins in 1999 with those in 2002, this Court finds that the ITC made the required statutory inquiry and found that underselling was not significant.

Second, this Court finds that the ITC's determination that underselling was not significant is supported by substantial evidence.  "[T]he ITC [has] broad discretion in analyzing and assessing the significance of the evidence on price undercutting."  *Copperweld Corp. v. United States*, 682 F. Supp. 552, 565 (Ct. Int'l Trade 1988) (citing S. REP. NO. 96-249, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. at 474; *see also*, *U.S. Steel Group*, 873 F. Supp. at 699.  The Court is not persuaded by Nucor's contention that the ITC's underselling finding in this investigation is unsupported by substantial evidence because it conflicts with other ITC determinations.  (*See* Nucor's Br. at 31-33.)  As stated earlier, "[t]his Court has recognized that 'each injury investigation is *sui generis*, involving a unique combination and interaction of many

economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the [ITC] as dispositive of the determination in a later investigation.'" *Ranchers-Cattlemen Action Legal Found.*, 74 F. Supp. 2d at 1379 (quoting *Citrosuco Paulista*, 704 F. Supp. at 1087-1088) (in turn quoting *Armstrong Bros. Tool*, 489 F. Supp. at 279). Contrary to Nucor's contentions, the ITC is not obligated to distinguish its determination under the facts of this investigation from prior determinations where no established agency practice has been shown. *See Aimcor v. United States*, 86 F. Supp. 2d 1248, 1254 (Ct. Int'l Trade 1999). Nucor references specific evidentiary findings made by the ITC in prior determinations and does not show that the ITC had an established practice of finding certain facts determinative in its underselling analyses. Thus, the other determinations do not detract from the reasonableness of the ITC's underselling finding.

The ITC "exercise[s] its discretion to select a particular methodology and as long as substantial evidence supports that choice, the Court reviewing such methodology will sustain the [agency's] decision." *Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 558 (Ct. Int'l Trade 1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990). Here, the ITC selected to examine the underselling data using an average margin methodology. *Cold-Rolled I* at 34. Although Plaintiffs contend that the underselling data should have been examined in terms of volume, "the [ITC] is not obligated to conduct a price comparison analysis that accounts for variations in sales volumes." *Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1341 (Ct. Int'l Trade 2001) (citation omitted), *vacated on different grounds after remand*, 345 F.3d 1379 (Fed. Cir. 2003). Even if the ITC had addressed underselling in terms of volume in its determination, the record supports the ITC's conclusion that underselling was not significant during the most recent

period of the POI. The ITC's Final Staff Report includes a summary of underselling in terms of volume and demonstrates that there were no reported instances of underselling from April 2002 to June 2002. (*See* Final Staff Report at V-14.)

This Court is not persuaded by Plaintiffs' contentions that the ITC's determination is unsupported by substantial evidence because the ITC failed to consider certain evidence presented during the administrative hearing addressing <u>why</u> underselling declined during the POI. Specifically, Plaintiffs contend that the ITC failed to consider testimony offered at the hearing that explained that the margins of underselling declined because the domestic industry made an effort to match import prices. (*See* Domestic Integrated Producers' Br. at 61-62 (citing Hr'g Tr. at 111-112, 61-62, 134, 109-110 (P.R. 157)).) This Court has held that "[t]he [ITC] is presumed to have considered all of the evidence in the record[,] . . . especially . . . where the facts allegedly ignored were presented to the [ITC] at a[n] open hearing." *Nat'l Ass'n of Mirror Mfrs. v. Untied States*, 696 F. Supp. 642, 648 (Ct. Int'l Trade 1988) (citations omitted). The ITC is presumed to have considered this testimonial evidence presented during the administrative hearing. The ITC acknowledged the fact domestic producers were seen as price leaders in the domestic market: "[a] substantial majority of purchasers identified U.S. Mills are price leaders in the U.S. market." *Cold-Rolled I* at 34 & n.204. The ITC is not required to evaluate if price leadership was the reason why underselling may have decreased or increased in its consideration of underselling. *Metallverken Nederland B.V.*, 728 F. Supp. at 739.

Finally, this Court finds that it was reasonable for the ITC to compare 1999 underselling margins with 2002 underselling margins because, as the ITC explained, its "analysis of the record includes the entire period for which data were collected, but distinguishes between events that

occurred prior to the Section 201 action and events that occurred afterward." *Cold-Rolled I* at 31 n.182.  As detailed above, this Court holds that the ITC's finding that the Section 201 proceedings had a significant impact on cold-rolled imports is supported by substantial evidence. *See supra* Part II.ANALYSIS.A.1, pp. 60-71.  Thus, it was reasonable for the ITC to compare data prior to the Section 201 proceedings, i.e., 1999 data, with data from after the Section 201 proceedings, i.e., 2002 data.  Further, the record evidence demonstrates that there was a steady decline in underselling margins throughout the POI, such that even if the ITC had compared data from 2002 with 2001 or with 2000, the record would still reflect a decline.  *See* Final Staff Report at V-9–V-12 (reporting that the simple average margin of underselling to end users was 24.8 in 1999, 6.4 in 2000, 5.6 in 2001, 1.5 in 2002; the simple average margin of underselling to service centers was 9.1 in 1999, overselling of 3.5 in 2000, underselling of 0.9 in 2001, and overselling of 4.0 in 2002).  This Court finds that the ITC's determination that underselling was not significant during the POI is supported by substantial evidence.

**2.  The ITC's Finding that the Subject Imports did not Otherwise Suppress or Depress Domestic Prices to a Significant Degree is Supported by Substantial Evidence.**

This Court holds that the ITC's determination that the subject imports did not suppress or depress domestic prices is supported by substantial evidence.  First, the Court finds that the ITC considered price data from the entire POI and reasonably focused on price data from 2002.  *See Taiwan Semiconductor Indus. Ass'n*, 93 F. Supp. 2d at 1294 n.13 (citing *Seafoods II*, 19 Ct. Int'l Trade at 48).  Contrary to Domestic Integrated Producers' contentions, this Court finds that the ITC considered the spot price data from the entire POI, including data from January 2002.  Although the ITC did not specifically discuss the increase in spot prices in January 2002, the ITC

did discuss the rising prices during the entire first half of 2002 reported in the pricing

questionnaires and demonstrated by the pricing data collected by the ITC.  *See Cold-Rolled I* at

35 (citing Final Staff Report App. H, at Tables H-1–H-4).

Second, the Court finds that the ITC was not required to specifically address a certain

monthly spot price report submitted by Domestic Integrated Producers.  As this Court stated

above, the ITC is not required to reference every exhibit placed on the record.  "Further, the fact

that the ITC chose not to focus on certain data in its main report does not indicate that the ITC

failed to consider that information as 'there is no statutory requirement that the [ITC] respond to

each piece of evidence presented by the parties.'  Rather, such a finding merely indicates the ITC

decided not to focus on such data in its main report."  *Ranchers-Cattlemen Action Legal Found.*,

74 F. Supp. 2d at 1379 (quoting *Granges Metallverken*, 716 F. Supp. at 24).

Third, the Court finds that the ITC's comparison of spot prices for cold-rolled, hot-rolled,

and coated steel imports supports the ITC's finding that the subject imports did not suppress or

depress domestic prices.  The ITC's conclusion that subject imports did not suppress or depress

domestic prices is supported by the fact that spot prices for all three products "exhibited similar

trends and similar dramatic increases" after the Section 201 proceedings.  *Cold-Rolled I* at 29.

Additionally, the ITC's finding is supported by the fact that spot prices for the three products'

increased from June 2001 to June 2002: specifically, cold-rolled steel spot prices increased from

$340 in June 2001 to $435 in June 2002.  *Id*.  The ITC acknowledged the "integrated production

process" of the three steel products.  *Id.* at 29 n.173.  The ITC found that the probative value of

the spot-price comparisons outweighed other evidence submitted by the parties because the spot

price comparisons focused on these three related steel products.  As stated above, "[t]he Court's

function is not to re-weigh the evidence but rather to ascertain whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Chefline Corp.*, 219 F. Supp. 2d at 1305 (quoting *Consol. Edison*, 305 U.S. at 229).  Here, the Court finds that the ITC's comparisons were supported by substantial evidence.

Next, the Court is not persuaded by Plaintiffs' contention that domestic spot price recovery should be attributed to the pending AD/CVD investigations and not to the Section 201 relief.  Although Plaintiffs again cite to the econometric analysis provided by Nucor in support of this contention, as detailed in the Court's analysis of the ITC's volume finding, the Court finds that the ITC fully examined this econometric analysis and articulated a satisfactory explanation for giving it little weight.  *See supra* Part II.ANALYSIS.A.1.e, pp. 68-69.

Finally, the Court finds that the ITC adequately considered the effect that the earlier-negotiated contracts had on domestic prices in 2002 and reasonably found that the these effects were insufficient to find that subject imports adversely affected domestic prices to a significant degree.  Specifically, the ITC acknowledged that domestic prices in 2002 were not the highest of the POI and "attribute[d] this to the fact that although some contracts have been renegotiated as a result of the sharp increase in spot prices, many contracts continue to be honored at the price levels negotiated at the end of 2001 when prevailing market prices were significantly lower." *Cold-Rolled I* at 35 (citing Hr'g Tr. at 64, 79-80, 115, 147 (P.R. 157)).  The ITC balanced the evidence of the contracts' effect on domestic prices against the other evidence of spot price recovery and the dramatic decline in subject import volumes during 2002.  *Cold-Rolled I* at 36. The ITC concluded that although subject imports that entered earlier in the POI "continue to have an effect on the industry's contract prices negotiated before the Section 201 relief was effective,

subject imports currently entering the market are not suppressing current domestic prices to a significant degree." *Id.* Although Plaintiffs may have wanted the ITC to place greater weight on the contract prices than it did, it cannot be said that the ITC overlooked the possibility that the earlier subject imports continued to have an effect on domestic contract prices. It was reasonable for the ITC to conclude that subject imports were not suppressing or depressing domestic prices, even though many contracts continued to be honored at lower prices, based on the record evidence that demonstrates the recovery of spot prices in 2002, the spot prices' effect on contracts, and the overall decline of subject imports in the most recent period examined.

This Court finds that there was substantial evidence to support the ITC's conclusion that subject imports were not adversely affecting domestic prices.

## IV.  The Subject Imports' Impact on the Domestic Industry.

### ITC'S DETERMINATION

The ITC noted that the final component of the ITC's material injury determination is an examination of the subject imports' impact on the domestic industry. *Cold-Rolled I* at 36; 19 U.S.C. § 1677(7)(B)(i)(III). The ITC stated that it must consider "all relevant economic factors which have a bearing on the state of the industry in the United States." *Id*. (citing 19 U.S.C. § 1677(7)(C)(iii)).

The ITC evaluated the domestic market conditions during the POI. *Id.* at 36-39. The ITC examined U.S. consumption, domestic market share, domestic output indicators (e.g., domestic production, and capacity utilization), industry sales revenues, operating losses, employment indicators (e.g., productivity, hours worked, wages paid), and capital expenditures. *Id.* at 37-39.

The ITC concluded that the condition of the domestic industry began to improve after the imposition of Section 201 relief. *Id.* at 39. After examining official Commerce import statistics and questionnaire responses, the ITC found that most of the domestic industry indicators followed this general pattern: varying results from 1999 to 2000; overall decline from 2000 to 2001; and dramatic overall recovery in the first half of 2002, as compared to the first half of 2001. *Id.* at 37-39.

Specifically, the ITC observed that apparent U.S. consumption of cold-rolled steel products in the total market declined to 35.6 million short tons in 2001 from 39.6 million in 2000 and 39.8 million in 1999, and then increased to 17.2 million short tons in the first half of 2002 as compared to 16 million in the first half of 2001. *Id.* at 37. However, in the merchant market, apparent U.S. consumption declined to 6.92 million short tons in the first half of 2002 from 6.94 million in the first half of 2001. *Id.*

The ITC noted that the domestic share of the merchant market decreased in 2001 to 81.7% from 85.9% in 2000 and 82.9% in 1999, but increased in the first half of 2002 to 89.0% compared to 81.2% in the first half of 2001. *Id.* at 37-38. The domestic share of the total market decreased in 2001 to 91.9% from 93.6% in 2000 and 92.2% in 1999, but then increased in the first half of 2002 to 95.6% compared to 91.9% in the first half of 2001. *Id.*

Domestic production declined from a high of 37.4 million short tons in 1999 to 33.1 million in 2001, but then increased in the first half of 2002 to 16.8 million short tons as compared to 14.8 million in the first half of 2001. *Id.* at 38. Capacity utilization steadily decreased from 85.8% in 1999 to 83.1% in 2000 and 75.1% in 2001, but increased in the second quarter of 2002 to 89.9% compared to 73.5% in the second quarter of 2001. *Id.*

The ITC found that from 2000 to 2001, the domestic industry "incurred heavy financial losses" attributable to declining sales values, a drop in prices after a dramatic decline in demand, and "low-priced subject imports gain[ing] U.S. market share." *Id.* at 37.  However, the ITC observed a pattern of recovery in the first half of 2002: the domestic industry had operating losses of $153 million in 1999 and $2 billion in 2001, but only incurred losses of $688 million in the first half of 2002 as compared to $926 million in the first half of 2001.  *Id.* at 38.  When comparing operating losses as a percentage of net sales, the ITC noted recovery in 2002: 1.2% in 1999, 1.7% in 2000, and 18.8% in 2001, declining to 11.1% in the first half of 2002 compared to 16.8% in the first half of 2001.  *Id.* at 38 & n.239.

The ITC's investigation of worker statistics provided mixed results.  *Id.* at 39.  For instance, the number of production and related workers and hours worked declined, yet wages paid increased.  *Id.*  The ITC noted that over the entire POI productivity also increased each year.  *Id*.  Finally, the ITC found that questionnaire responses from domestic producers indicated that capital expenditures declined from 1999 to 2000, increased in 2001, and continued to increase in the first half of 2002 compared with the first half of 2001.  *Id*.

The ITC found that the "present condition of the domestic industry" was not attributable "in any material respect to the current subject imports."  *Id.*  Thus, the ITC concluded that it "d[id] not find that any material injury currently being experienced by the domestic industry is by reason of the subject imports."  *Id.* at 39.

PARTIES' CONTENTIONS

## A.  Nucor's Contentions.

First, Nucor contends that the ITC improperly based its impact finding on its erroneous

volume analysis, and because the ITC's volume analysis was flawed, as argued earlier, the ITC's impact finding based on that analysis is also unsupported by substantial evidence. (Nucor's Br. at 36-37.) Second, Nucor contends that the ITC improperly based its impact finding on the assertion that the Section 201 remedy produced recovery in domestic industry, and that assertion is flawed because the ITC dismissed the econometric analysis provided by petitioners and the effect that the AD/CVD investigations had on domestic prices. (*Id.* at 37.) Third, Nucor contends that the ITC overlooked record evidence that demonstrated the impact that subject imports entered earlier in the POI continued to have on the domestic market. (*Id.* at 38.) Specifically, Nucor points to the ITC 's statement that "subject imports which entered the market earlier in the [POI] continue to have an effect on the industry's contract prices negotiated before the Section 201 relief was effective" and the fact that the ITC acknowledged that 55% of the domestic industry's commercial sales were by annual contract. (*Id.* (citing *Cold-Rolled I* at 36).) Nucor asserts that these earlier-negotiated contracts had a significant impact on the domestic industry. (*Id.*)

Additionally, Nucor contends that the ITC ignored evidence of a "natural experiment" that was the "clearest possible proof" that the subject imports impacted the domestic industry. (*Id.* at 41.) Nucor notes that in 1999, AD/CVD investigations were initiated involving ten countries which are also subject to these investigations. (*Id.*) Nucor asserts that after the ITC made a negative injury determination in March 2000, the domestic industry suffered as imports increased and domestic prices declined. (*Id.* at 42.) Nucor contends that the ITC dismissed Nucor's arguments regarding this earlier 1999 investigation stating in a footnote that the "fluctuations and uncertainty that occur in the market" were not proof of material injury. (*Id.* at

43 (citing *Cold-Rolled I* at 37 n.223).) Nucor asserts that the ITC misunderstood what the 1999 investigation demonstrated: "when cold-rolled imports left the market, the domestic industry's sales increased and its financial performance improved . . . when imports re-entered the U.S. market in large quantities, prices fell and the U.S. industry suffered mounting financial harm." (*Id.* at 44.)

Finally, Nucor reemphasizes the financial losses of the domestic steel industry during the POI as further evidence of the subject imports' adverse impact on the domestic industry. (*Id.*) Nucor contends that even in the first half of 2002, when alleged improvements in the industry occurred, the domestic producers operating losses were still $688 million. (*Id.* at 46 (citing *Cold-Rolled I* at 38).) Nucor concedes that this loss is less than in 2001, but asserts that "a loss of this scale constitutes injury by any meaningful measure." (*Id.*) Nucor contends that in the past, the ITC has found injury even when the domestic industry appeared to improve in the later part of the period of investigation. (*Id.* at 46-47 (citing *Tin- and Chromium-Coated Steel Sheet From Japan*, Inv. No. 731-TA-860 (Final), USITC Pub. 3337 at 26, Table VI-2 (Aug. 2000); *Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and Tobago, Turkey, and Ukraine*, Invs. Nos. 701-TA-417-421, 731-TA-953, 954, 956-959, 961, 962 (Final), USITC Pub. 3546 at 32, Table VI-2 (Oct. 2002); *Certain Welded Large Diameter Line Pipe from Japan*, Inv. No. 731-TA-919 (Final) USITC Pub. 3464 at 19, Table VI-2 (Nov. 2001); *Hot Rolled Steel Products From Argentina and South Africa*, Invs. Nos. 701-TA-404, 731-TA-898, 905 (Final), USITC Pub. 3446 at 23 (Aug. 2001)).)

**B. Domestic Integrated Producers' Contentions.**

Domestic Integrated Producers contend that the ITC's impact finding is unsupported by

substantial evidence because the ITC disregarded record evidence of adverse impact during the majority of the POI and instead focused only on data from the first half of 2002. (Domestic Integrated Producers' Br. at 70.) Domestic Integrated Producers assert that the domestic industry continued to feel the adverse impact of the subject imports even in the first half of 2002. (*Id.*) Domestic Integrated Producers contend that the domestic industry continued to suffer severe financial losses: $688 million in operating losses in the first half of 2002, "four times the operating loss posted in all of calendar year 1999." (*Id.*) Domestic Integrated Producers also contend that because a majority of sales are made through contracts, and most contracts in 2002 continued to be honored at low 2001 prices, the domestic industry continued to be adversely impacted by the subject imports in 2002. (*Id.* at 71.) Further, Domestic Integrated Producers contend that the ITC's impact findings are "completely dependent upon its flawed volume and price analysis," and because these underlying analyses are flawed, the ITC's impact finding is unsupported by substantial evidence. (*Id*. at 72.)

## C. Defendant's Contentions.

Defendant contends that the ITC's impact finding was supported by substantial evidence. (Def.'s Br. at 81.) Defendant contends that Plaintiffs are seeking *de novo* review of the evidence fully presented and examined by the ITC in its final determinations. (*Id.* at 83.) Defendant asserts that contrary to the statutory mandate, Plaintiffs' contentions regarding impact focus only on one economic factor: the domestic industry's operating losses. (*Id.* (citing Domestic Integrated Producers' Br. at 69-71, Nucor's Br. at 44-46).) Defendant contends that the statute requires the ITC to include a consideration of "all relevant economic factors" in its impact analysis and not just rely on one single factor as the Plaintiffs have. (*Id.* (quoting 19 U.S.C.

§ 1677(7)(C)(iii)).) Defendant contends that examining profitability as one of many factors to consider "underscore[s] the legislative intent that absence of profits shall not act as a proxy for injury." (*Id.* at 83-84 (quoting *Am. Spring Wire Corp. v. United States*, 590 F. Supp. 1273, 1279 (Ct. Int'l Trade 1984)).) Defendant contends that the ITC properly examined various economic factors in determining "that the subject imports were not currently causing material injury to the domestic industry." (*Id.* at 85.) Defendant contends that the ITC's impact analysis included a detailed discussion of the "evolving condition of the domestic industry" during the POI. (*Id.* at 84.) Defendant points to data that indicate that the ITC's finding was reasonable. (*Id.*) Specifically, Defendant notes that during the first half of 2002, domestic producers gained market share, domestic production increased, capacity utilization increased, wages paid increased, hourly wages and productivity increased, capital expenditures increased, and operating losses decreased. (*Id.* at 84-85 (citing *Cold-Rolled I* at 50-52).)

Defendant contends that "Nucor again ignores that [ITC] determinations are *sui generis*" when it asks this Court to evaluate this case in light of prior ITC determinations that found injury when the domestic industry showed improvement at the end of the period of investigation. (*Id.* at 85-86.) Lastly, Defendant contends that the ITC's findings that the volume of subject imports was not significant and that subject imports did not adversely affect domestic prices were supported by substantial evidence; thus, the ITC "could not find a material adverse impact or material injury" without significant volume or price effects. (*Id.* at 86-87.)

## D. Defendant-Intervenors' Contentions.

Defendant-Intervenors contend that the ITC's determination regarding the impact of the subject imports on the domestic cold-rolled steel industry is supported by substantial evidence.

(Def.-Intvs.' Br. at 64.)  Defendant-Intervenors contend that the ITC found that the Section 201

proceedings "severed any causal nexus between subject imports and the [domestic industry's]

operating losses." (*Id*.)  Defendant-Intervenors contend that Plaintiffs "conveniently ignore" the

ITC's discussion of other industry factors and instead focus only on the industry's operating

income. (*Id.* at 65.)  Defendant-Intervenors contend that the ITC followed the statute's directive

to consider "all relevant economic factors" in determining that the subject imports were not

adversely impacting the domestic market. (*Id*. (quoting 19 U.S.C. § 1677(7)(C)(iii)).)

Defendant-Intervenors contend that the record evidence supports the ITC's conclusion, noting

that the following performance indicators all showed improvement in 2002: the domestic

producers' share of the merchant market; domestic production; domestic shipments; capacity

utilization; net sales; productivity; and capital expenditures. (*Id.* at 66-67 (citing *Cold-Rolled I* at

37-39).)  Defendant-Intervenors contend that these improvements demonstrate the domestic

industry's recovery in the latter part of the POI. (*Id.* at 68.)  Defendant-Intervenors conclude that

the ITC's determination that the domestic industry was not adversely impacted by the subject

imports is supported by substantial evidence. (*Id.* at 69.)

### ANALYSIS

**A. The ITC's Finding that the Subject Imports Did Not Adversely Impact the Domestic Industry is Supported by Substantial Evidence.**

         This Court holds that the ITC's impact finding is supported by substantial evidence.  The

final component of the ITC's material injury determination is an examination of the subject

imports' impact on the domestic industry.  19 U.S.C. § 1677(7)(B)(i)(III).  In this analysis, the

ITC must consider "all relevant economic factors which have a bearing on the state of the

industry in the United States."  19 U.S.C. § 1677(7)(C)(iii).  Here, the ITC evaluated various market conditions during the POI and concluded that "the present condition of the domestic industry" was not "attributable in any material respect to the current subject imports."  *Id.* at 39.

This Court has already discussed and dismissed Plaintiffs' contentions regarding the ITC's focus on current data, the ITC's finding that the Section 201 remedy was the overwhelming factor in the decline of subject imports, the ITC's evaluation of the AD/CVD investigations' effect on post-petition data, and the ITC's discussion of the earlier-negotiated contracts.  *See supra* Parts I.ANALYSIS.A, pp. 26-27; II.ANALYSIS.A.1, pp. 60-71; III.ANALYSIS.A.2, p. 93.  The Court need not address those contentions again.  This Court finds that Plaintiffs' remaining arguments do not detract from the reasonableness of the ITC's finding that the subject imports were not adversely impacting the domestic industry.

First, the Court finds that the ITC adequately addressed Nucor's argument that the 1999 AD/CVD investigations were a "natural experiment" in its final determination and reasonably concluded that the argument was not persuasive.  The ITC stated that it had "considered how market conditions, including the previous and pending Title VII cases and the more recent Section 201 relief, affected trends in import volumes and prices."  *Cold-Rolled I* at 37 n.223 (emphasis added).  The ITC then expressly rejected Nucor's "natural experiment" theory by stating that pending AD/CVD investigations "inject some uncertainty into the market," but that these fluctuations in the market "do not in and of themselves prove that, prior to the filing of [the AD/CVD petition], imports are causing material injury."  *Id*.  The Court will not disturb the ITC's findings where, as here, the ITC considered conflicting evidence, yet reasonably determined that other factors were "of greater moment."  *See Makita Corp. v. United States*, 974

F. Supp. 770, 786 (Ct. Int'l Trade 1997).

Next, Plaintiffs highlight the operating losses suffered by the domestic industry throughout the POI, but do not discuss the other "relevant economic factors" that the ITC considered in making its negative impact finding. *See* 19 U.S.C. § 1677(7)(C)(iii). Plaintiffs correctly note that the domestic industry continued to suffer severe operating losses even in the first half of 2002. *See Cold-Rolled I* at 38. However, the ITC considered this operating loss and balanced it against other record evidence that showed improvements in the domestic market. *Id.* at 37-39. For example, the ITC found that the total market consumption, the domestic share of the merchant market and total market, domestic production, capacity utilization, and capital expenditures all substantially increased in 2002 compared to 2001 data. *Id.* Additionally, although the domestic industry continued to suffer operating losses, the losses were less in 2002 than in 2001. *Id.* at 38. This Court finds that the ITC based its negative impact finding on a consideration of the various economic factors that showed significant improvement in the most recent period examined. Coupled with the ITC's findings regarding the subject imports' volume and price effects, this Court holds that the ITC's impact finding is supported by substantial evidence.

## V. Cumulation of Subject Imports from Australia.

### ITC'S DETERMINATION

In making its final determination, the ITC recognized that under § 1677(7)(G)(i), it must cumulatively assess the subject imports from all countries as to which petitions were filed on the same day, if the imports compete with each other and with the domestic like product in the

domestic market. *Cold-Rolled I* at 15 (citing 19 U.S.C. § 1677(7)(G)(i)). The ITC identified the four factors generally considered when determining cumulation: "(1) the degree of fungibility between the subject imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions; (2) the presence of sale or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and (4) whether the subject imports are simultaneously present in the market." *Id.* at 15 (citing *Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Invs. Nos. 731-TA-278-280 (Final), USCIT Pub. 1845 at 8 n.29 (May 1986), *aff'd sub nom. Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898 (Ct. Int'l Trade 1988), *aff'd* 859 F.2d 915 (Fed. Cir. 1988). The ITC noted that this list of factors is nonexclusive and is "intended to provide the [ITC] with a framework for determining whether the subject imports compete with each other and with the domestic like product." *Id.* at 16 (citing *Wieland Werke, AG v. United States*, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

First, the ITC found that there was a "reasonable overlap of competition among the subject imports and with the domestic like product for all subject imports, except with respect to Australia." *Id.* The ITC did not cumulate the subject imports from Australia in its material injury analysis. *Id.* The ITC found that "[v]irtually all subject imports from Australia are full-hard steel . . . [and] enter the United States through the West region." *Id.* at 16 (citing Final Staff Report at Table IV-5; Posthr'g Br. of BHP Steel, LTD., New Zealand Steel, Ltd., and BHP Steel Americas, LLC at 1 (P.R. 180) (C.R. 289)). The ITC further noted that all of the Australian

subject imports were "sold entirely on the open market to two end user customers located in the West region." *Id.* The ITC found that the domestic supply of full-hard steel in the West region is limited and that the overlap between Australian subject imports, other subject imports, and the domestic like product is very limited. *Id.* The ITC also noted that domestic production of full-hard steel was limited in the West region during the POI because of "the significant reduction of production at UPI, a West Coast producers of the full-hard product, following a fire at UPI's facilities." *Id.* at 16 n.84 (citing Final Staff Report at VI-3 n.4). After reviewing 2001 data reflecting the percentage of domestic commercial full-hard steel shipments in the West region, the ITC concluded that "the record does not establish a reasonable overlap of competition between the domestic like product and the subject merchandise from Australia." *Id.*

Second, the ITC found that there was no reasonable overlap of competition between Australian imports and imports from other subject countries. *Id.* at 17 n.85. The ITC stated that "there is a very limited degree of fungibility between cold-rolled steel from Australia and cold-rolled steel from the other subject countries." *Id.* The ITC found that "no other country has the same degree of concentration" of full-hard steel imports. *Id.* (citing Final Staff Report at Table IV-7C; Final Staff Report App. C, at Table C-8). The ITC also found limited geographic market overlap: "imports from Australia were concentrated geographically in the West region (99.7 percent), and virtually absent from the geographic markets of the East, Gulf, and Great Lakes through which more than 80 percent of subject imports were entered." *Id.* (citing Final Staff Report at Table IV-5). The ITC also found that "[o]nly one small-volume supplier, New Zealand, had a comparable level of regional concentration on the West Coast." *Id.* Finally, the ITC found that "100 percent of imports from Australia were sold directly to end users," whereas

only two other countries had a similar concentration in sales to end users. *Id.* The ITC conceded that although Australian imports were "present throughout the period examined," the other factors considered did not indicate that cumulation was appropriate. *Id.*

### PARTIES' CONTENTIONS

**A. Nucor's Contentions.**

Nucor does not address this issue in its briefs.

**B. Domestic Integrated Producers' Contentions.**

Domestic Integrated Producers contend that the ITC's determination not to cumulate imports from Australia is unsupported by substantial evidence. (Domestic Integrated Producers' Br. at 73.) Specifically, Domestic Integrated Producers challenge two of the ITC's findings: (1) that there was no reasonable overlap of competition between the imports from Australia and the domestic like product; and (2) that there was no reasonable overlap of competition between the imports from Australia and the imports from all other subject countries. (*Id.*)

First, regarding overlap with the domestic like product, Domestic Integrated Producers challenge the ITC's factual findings as to the domestic industry's shipments of full-hard steel to the West region. (*Id.* at 74-75.) Domestic Integrated Producers contend that the ITC in effect created a "low volume exception" to the cumulation statute. (*Id.* at 77.) Domestic Integrated Producers assert that all other statutory requirements for cumulation were present, however, the ITC did not find a reasonable overlap of competition because "the domestic industry did not ship large enough volume to [the West]." (*Id.*) Domestic Integrated Producers contend that the ITC has previously articulated "an established agency practice" of finding a reasonable overlap of competition even if there are low volume levels. (*Id.* at 78.) To support their proposition,

Domestic Integrated Producers cite a prior ITC determination wherein the ITC found a reasonable overlap of competition between a low volume of imports from a certain country and the domestic like product even though there was a larger volume of the domestic like product. (*Id.* (citing *Hot-Rolled Steel Products from Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine*, Invs. Nos. 701-TA-404–408 (Prelim.), 731-TA-898-908 (Prelim.), USITC Pub. 3381 at 11 n.63 (Jan. 2001)).) Domestic Integrated Producers contend that the ITC cannot create a "low volume exception" for the domestic like product when there is no "low volume exception" for imports. (*Id.*)

Domestic Integrated Producers also note that the ITC failed to address evidence in the record that showed that the domestic industry was "actively solicit[ing]" business in the West and routinely sold cold-rolled steel in the region. (*Id.* at 79 (citing Hr'g Tr. at 153, 190 (P.R. 157)).)

Second, Domestic Integrated Producers contend that there was a reasonable overlap of competition between Australian import and imports from all other subject countries. (*Id.*) The Domestic Integrated Producers challenge the ITC's heavy focus on the West region. (*Id.* at 81.) Domestic Integrated Producers contend that the record evidence demonstrates that at least three other subject countries primarily shipped their imports to the West, and that the West was an important entry point for eight subject countries. (*Id.* at 81-82.) Domestic Integrated Producers conclude that this evidence supports a finding that there was a reasonable overlap of competition between Australian imports and imports from the other subject countries. (*Id.*)

## C. Defendant's Contentions.

Defendant contends that the ITC's findings regarding the cumulation of subject imports

from Australia was supported by substantial evidence and is otherwise in accordance with law.

(Def.'s Br. at 89.)  Defendant asserts that the ITC properly determined that the record "does not

establish a reasonable overlap of competition" between the domestic like product and imports

from Australia.  (*Id.*)  Defendant contends that the ITC properly considered the requirements for

cumulation under 19 U.S.C. § 1677(7)(G)(i).  (*Id.*)  Defendant contends that the ITC's findings

regarding the lack of geographic market overlap, similar channels of distribution, and

simultaneous presence in the market are supported by substantial evidence in the record.  (*Id.* at

90-93.)  Defendant notes that the ITC found that virtually all imports from Australia entered

through the West region and were sold only in the West region.  (*Id.* (citing *Cold-Rolled I* at 20).)

Defendant also notes that the ITC found that the domestic producers' sales of the same product in

the West region were extremely limited.  (*Id.* at 91.)  Defendant contends that the Staff Report

Table upon which Domestic Integrated Producers' rely in making their arguments, confirms the

ITC's finding that virtually all the subject imports from Australia entered the West region.  (*Id.*

(citing Final Staff Report at Table IV-5).)  Defendant also contends that the ITC found that only a

very small percentage of the domestic producers' merchant market sales of cold-rolled products

were in the West.  (*Id.* at 92 (citing *Cold-Rolled I* at 20).)  Defendant contends that the ITC

reasonably found that the domestic like product was "not reaching the West region market in

sufficient quantities to reflect a reasonable overlap of competition."  (*Id.* at 92 n.174.)

Additionally, Defendant notes that the ITC found that domestic production of the competitive

product was limited by a fire at one domestic facility.  (*Id.* at 93 (citing *Cold-Rolled I* at 20

n.84).)  Defendant contends that the evidence before the ITC was sufficient to support a

reasonable conclusion that there was no overlap of competition between Australian imports and

the domestic like product.  (*Id*.)

Defendant discounts Domestic Integrated Producers' contention that the ITC created a "low volume exception" to cumulation.  (*Id.*)  Defendant contends that the ITC followed the traditional analysis outlined in the statute and found that there was no "rivalry in the market place, where goods will be purchased from those who provide the 'most for the money.'"  (*Id.* at 94 (quoting *Weiland Werke*, 718 F. Supp. at 52) (in turn quoting *Granges Metallverken*, 716 F. Supp. at 22).)  Defendant claims that the Domestic Integrated Producers' contentions regarding cumulation are tantamount to a request for this Court to re-weigh the evidence.  (*Id*.)

Regarding the Domestic Integrated Producer's contentions that there was a reasonable overlap of competition between Australian imports and subject imports from other countries, Defendant asserts that the ITC's finding of an absence of reasonable overlap between the domestic like product and the Australian product precludes cumulation regardless of overlap with other subject countries.  (*Id*.)  Defendant concludes that the ITC's determination not to cumulate Australian imports was supported by substantial evidence.  (*Id.* at 94-95.)

**D.  Defendant-Intervenors' Contentions.**[10]

Defendant-Intervenors contend that the ITC's decision not to cumulate subject imports from Australia is supported by substantial evidence.  (BHP Steel's Br. at 10; Def.-Intvs.' Br. at 76.)  First, Defendant-Intervenors contend that the ITC correctly applied the statutory

---

[10] One Defendant-Intervenor, BHP Steel Ltd. (comprised of BHP Steel (AIS) Pty Ltd., BHP New Zealand Steel Ltd., and BHP Steel), filed a separate brief specifically addressing this issue.  (*See* Mem. of BHP Steel, Ltd. in Opp'n to the Pls.' Rule 56.2 M. for J. on the Agency R. ("BHP Steel's Br.") at 2.)  In their joint brief, Defendant-Intervenors expressly adopt the arguments presented in BHP Steel's brief.  (*See* Def.-Intvs.' Br. at 76.)  The contentions are presented together herein.

requirements and properly found that there was no reasonable overlap of competition between the domestic like product and subject imports from Australia. (BHP Steel's Br. at 13; Def.-Intvs.' Br. at 76.) Defendant-Intervenors assert that the ITC correctly found that virtually all Australian subject imports were full-hard steel shipments to the West region. (BHP Steel's Br. at 13; Def.-Intvs.' Br. at 78.) Defendant-Intervenors contend that the ITC also correctly determined that only "a tiny fraction" of the domestic like product was full-hard steel sold in the West region. (BHP Steel's Br. at 15.) Based on these facts, Defendant-Intervenors contend that the ITC properly concluded that there was no "rivalry to supply the same demand" between the domestic product and Australian imports. (Def.-Intvs.' Br. at 77.) Defendant-Intervenors contend that Plaintiffs "mischaracterize" the ITC findings as a "low volume exception" to cumulation. (BHP Steel's Br. at 14; Def.-Intvs.' Br. at 77.) Rather, Defendant-Intervenors assert that ITC explicitly found that "domestic full hard and imports from Australia were not competing for the same business." (BHP Steel's Br. at 15.) Defendant-Intervenors contend that the domestic supply of full-hard steel in the West was so small that the purchasers in the West "had no option but to turn to imports." (*Id*.) Defendant-Intervenors contend that the ITC considered extensive evidence documenting the lack of overlap of competition including various testimony at the hearing and questionnaire responses. (*Id*. at 16-18.) Defendant-Intervenors contend that the ITC properly disregarded certain evidence submitted by Domestic Integrated Producers during the administrative process regarding domestic producers' attempts to solicit business in the West because that evidence was not credible and was contradicted by other evidence in the record. (*Id*. at 19-20.) Defendant-Intervenors contend that the ITC's decision to give greater weight to some evidence than to other "may not be second guessed by this Court." (*Id*. at 21.)

Second, Defendant-Intervenors contend that the ITC's finding that Australian imports did not compete with other subject imports is supported by substantial evidence.  (BHP Steel's Br. at 21; Def.-Intvs.' Br. at 78.)  Defendant-Intervenors note that, under the statute, the ITC must find that Australian imports compete with the domestic like product and imports from other subject countries in order to cumulate.  (BHP Steel's Br. at 21-22 (citing 19 U.S.C. § 1677(7)(G)(i)).)  Defendant-Intervenors contend that the ITC correctly considered the four factors to cumulation: fungibility, geographic overlap, channels of distribution, and simultaneous presence in the market.  (*Id*. at 22.)  Contrary to Domestic Integrated Producers' assertions, Defendant-Intervenors contend that the ITC's finding that there was limited fungibility with other subject imports is supported by record evidence that demonstrates that full-hard steel is not interchangeable with other cold-rolled products.  (BHP Steel's Br. at 22; Def.-Intvs.' Br. at 78.)  Defendant-Intervenors also note that the ITC's determination is supported by the evidence that there was no geographic overlap between Australian imports and other subject imports because, with the exception of New Zealand, no other country sold exclusively to the West region.  (BHP Steel's Br. at 23 (citing *Cold-Rolled I* at 21 n.85); Defendant-Intervenors' Br. at 78.)  Defendant-Intervenors contend that the ITC also relied on evidence of different channels of distribution used.  (BHP Steel's Br. at 23.)

For these reasons, Defendant-Intervenors contend that the ITC's determination not to cumulate subject imports from Australia was supported by substantial evidence.  (BHP Steel's Br. at 24; Def.-Intvs.' Br. at 79.)

ANALYSIS

**A. The ITC's Cumulation Finding is Supported by Substantial Evidence.**

The Court finds that the ITC's determination not to cumulate subject imports from

Australia is supported by substantial evidence or otherwise in accordance with law. Pursuant to

§ 1677(7)(G)(i), the ITC must cumulatively assess the subject imports from all countries as to

which petitions were filed on the same day, if the imports compete with each other and with the

domestic like product in the domestic market. 19 U.S.C. § 1677(7)(G)(i). Here, the ITC outlined

the four factors generally considered in determining whether cumulation is appropriate: "(1) the

degree of fungibility between the subject imports from different countries and between imports

and the domestic like product, including consideration of specific customer requirements and

other quality related questions; (2) the presence of sales or offers to sell in the same geographic

markets of subject imports from different countries and the domestic like product; (3) the

existence of common or similar channels of distribution for subject imports from different

countries and the domestic like product; and (4) whether the subject imports are simultaneously

present in the market." *Cold-Rolled I* at 15 (citations omitted). The ITC correctly noted that this

list of factors is nonexclusive and is "intended to provide the [ITC] with a framework for

determining whether the subject imports compete with each other and with the domestic like

product." *Id.* at 16 (citing *Wieland Werke*, 718 F. Supp. at 52). The ITC found that there was a

"reasonable overlap of competition among the subject imports and with the domestic like product

for all subject imports, except with respect to Australia." *Id.*

1. **The ITC's Finding that There was No Reasonable Overlap of Competition Between Australian Subject Imports and the Domestic Like Product is Supported by Substantial Evidence.**

The Court finds that there is substantial evidence in the record to support the ITC's finding that there was no reasonable overlap of competition between Australian imports and the domestic like product. Contrary to Plaintiffs' contention, the Court does not find that the ITC created a "low volume exception" to the cumulation statute. Following its long-standing practice, the ITC examined the competition between Australian imports and the domestic like product using the factors outlined above. *See Wieland Werke*, 718 F. Supp. at 52. To support its conclusion that Australian imports and domestic like products were not competing, the ITC focused on two considerations: geographic market overlap and channels of distribution. As to geographic market overlap, the ITC found that "[v]irtually all subject imports from Australia are full-hard steel, a substrate form of cold-rolled steel, [and] enter the United States through the West region." *Cold-Rolled I* at 16 (citing Final Staff Report at Table IV-7C; Final Staff Report App. C, at Table C-8; Posthr'g Br. of BHP Steel, LTD., New Zealand Steel, Ltd., and BHP Steel Americas, LLC at 1 (P.R. 180) (C.R. 289)). This conclusion was based on the ITC finding that Australian imports "remained in the West region[] and were not sold in other geographic regions." *Id.* Regarding channels of distribution, the ITC noted that all of the Australian subject imports were "sold entirely on the open market to two end user customers located in the West region." *Id.* (citing Posthr'g Br. of BHP Steel, LTD., New Zealand Steel, Ltd., and BHP Steel Americas, LLC at 5 (P.R. 180) (C.R. 289)). After it examined confidential data reflecting the percentage of domestic commercial full-hard steel shipments in the West region, the ITC concluded that "the record does not establish a reasonable overlap of competition between the

domestic like product and the subject merchandise from Australia." *Id.* The ITC recognized that "[c]ompletely overlapping markets are not required," *id*. at 16 n.76 (quoting *Wieland Werke*, 718 F. Supp at 52), yet found that the facts here did not indicate that there was a reasonable overlap of competition between the domestic like product and subject imports from Australia, *id*. at 16. As stated earlier, "[t]he Court's function is not to re-weigh the evidence but rather to ascertain whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Chefline*, 219 F. Supp. 2d at 1305 (quoting *Consol. Edison*, 305 U.S. at 229). The Court finds that there is substantial evidence in the record to support the ITC's conclusion that the Australian imports of cold-rolled steel were not competing with the domestic like product.

Plaintiffs also contend that the ITC failed to address certain evidence submitted by petitioners during the administrative process that showed an overlap of competition between the domestic like product and Australian imports. As stated above, "the fact that certain information is not discussed in [an ITC] determination does not establish that the [ITC] failed to consider that information because there is no statutory requirement that the [ITC] respond to each piece of evidence presented by the parties." *Granges Metallverken*, 716 F. Supp. at 24 (citing *Nat'l Ass'n of Mirror Mfrs.*, 696 F. Supp. at 648-649. It is evident in the ITC's final determination that the ITC examined hearing testimony, domestic and import sales data, and the parties' briefs in reaching its decision regarding cumulation. *See Cold-Rolled I* at 16 nn.77-83.

**2. The ITC's Finding that There was No Reasonable Overlap of Competition Between Australian Subject Imports and Subject Imports from Other Countries is Supported by Substantial Evidence.**

The Court finds that there is substantial evidence in the record to support the ITC's

finding that there was no reasonable overlap of competition between subject imports from Australia and subject imports from other countries. Again, the ITC focused its cumulation analysis around the four factors that are generally considered. *Id.* at 17 n.85. In *Cold-Rolled I*, the ITC examined several factors relating to competition between Australian imports and other subject imports. *Id*. The ITC conceded that although Australian imports were "present throughout the period examined," the other factors considered did not indicate that cumulation was appropriate. *Id*. Plaintiffs do not present any evidence that detracts from the reasonableness of the ITC's conclusion that there was no reasonable overlap of competition between the subject imports from Australia and the subject imports from other countries.

The Court holds that the ITC's determination not to cumulate subject imports from Australia is supported by substantial evidence or otherwise is accordance with law.

## CONCLUSION

For the reasons set forth above, the Court holds that the ITC's final negative injury determinations are supported by substantial evidence or otherwise in accordance with law. Defendant-Intervenors' Consent Motion for Oral Argument is denied.

                                                          /s/ Gregory W. Carman
                                                          Judge

Dated: February 19, 2004
        New York, New York